UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANTHONY REBMANN,              ) | |
|             ) | |
|    Plaintiff,              ) | |
|             ) | |
|    v.                 ) | Case No. 1:21-cv-879-GWC |

ANTHONY REBMANN,       )

    Plaintiff,       )

    v.         )      Case No. 1:21-cv-879-GWC

ASTEC, INC. d/b/a Astec of Tennessee and  )
ASTEC INDUSTRIES, INC.,       )

    Defendants/Third-Party Plaintiffs,  )

    v.         )

GERNATT ASPHALT PRODUCTS, INC.,  )

    Third-Party Defendant.     )

**OPINION AND ORDER**
**(Docs. 66, 70, 73, 74, 75, 81, 85)**

In this product-liability case removed from New York Supreme Court, Plaintiff Anthony

Rebmann sues Astec, Inc. d/b/a Astec of Tennessee and Astec Industries, Inc. (collectively,

"Astec") based on an incident on March 19, 2020, when, in the course of his employment at an

asphalt plant, his left hand became entangled in an Astec baghouse screw conveyor.

(*See* Doc. 1-2.) Astec has answered (Doc. 1-6) and has also filed a Third-Party Complaint

against Mr. Rebmann's employer at the time, Gernatt Asphalt Products, Inc. ("Gernatt"),

claiming contribution and negligent training and supervision. (Doc. 27.)

Multiple motions are pending. The pending dispositive motions are Astec's motion for

summary judgment against Plaintiff (Doc. 70) and Astec's motion for partial summary judgment

against Gernatt (Doc. 73). Additional motions relating to expert witnesses are also pending.

Astec has moved to strike the report of Plaintiff's life-care expert, Nadeem Hussain, M.D.

(Doc. 66), and has also filed motions in limine to exclude the testimony of Plaintiff's products-warnings (or "human factors") expert, Gerald M. Goldhaber, Ph.D. (Doc. 74) and Plaintiff's products-liability expert Thomas Berry, P.E. (Doc. 75). Plaintiff has filed his own motion to exclude or limit the opinions of Astec's expert, Dennis Brickman, P.E. (Doc. 85.) Astec has filed a motion seeking to compel Plaintiff to pay fees for time that Mr. Brickman spent to attend his February 2025 deposition. (Doc. 81.) The court heard argument on all pending motions on May 18, 2026.

## **Procedural History**

Plaintiff filed his complaint in New York Supreme Court in March 2021. (Doc. 1-2.) The two causes of action are for: (1) "negligent, careless, reckless and/or unlawful conduct on the part of the defendants, ASTEC and/or ASTEC INDUSTRIES, by their agents, servants and/or employees, in the maintenance, design, manufacture and/or assembly of the aforesaid baghouse screw conveyor"; and (2) strict products liability. (*See id.*)

After removal to federal court, the court entered a Scheduling Order in September 2021. (Doc. 14.) A mediation in December 2021 did not result in settlement. (Doc. 16.) It appears that the case proceeded directly to discovery without any motions to dismiss. An early discovery dispute resulted in an order granting Plaintiff's motion to quash and granting his motion for a protective order in part. (Doc. 25.) Astec filed its third-party complaint against Gernatt in July 2022. (Doc. 27.) Another discovery dispute resulted in an order granting Plaintiff's motion to compel and granting an extension of time to complete discovery. (Doc. 48.) After a series of extensions (*see* Docs. 26, 35, 43, 48, 57, 62, 65), Astec filed its motion for summary judgment against Plaintiff on April 18, 2025. (Doc. 70.) Briefing was completed on that motion and on the other pending motions in July 2025.

2

## Background

In support of both of its Rule 56 motions, Astec has filed a 647-paragraph statement of facts. (Doc. 70-2.) Plaintiff and Gernatt have both filed statements in response. (Docs. 86, 87.) In addition, Plaintiff asserts that Astec's statement does not comply with Local Rule 56.1(a)(1)'s requirement that such statements be "short[] and concise," and seeks denial of the motion for that reason. (Doc. 86 at 1–2.) In reply, Astec contends that Plaintiff's response to the Rule 56 statement is itself deficient. (Doc. 97.)

The court concludes that the preferable use of judicial time and energy is to avoid nitpicking the parties' Rule 56 factual statements. The court has instead performed its own independent review of the record. *See, e.g., Concepts NREC, LLC v. Qiu*, No. 20-cv-133, 2025 WL 3012209, at *3 n.5 (D. Vt. Oct. 28, 2025) (court performed independent review of the summary judgment record). Because Mr. Rebmann was the only eyewitness to his injury on March 19, 2020—and because he is entitled to construction of the evidence in the light most favorable to him—the court draws particularly on Mr. Rebmann's testimony from his deposition (Doc. 70-12). Additional facts are set forth as necessary in the analysis below.

The standard equipment of an asphalt plant includes: (1) a control room, where the start and stop controls are located; (2) a drum and burner, which dries the aggregate; (3) a conveyance system, to move materials through the plant, including dust; and (4) a baghouse. (Doc. 70-2 ¶ 45.) The baghouse operates like a vacuum, removing combustion emissions and dust from the asphalt plant. (*Id.* ¶ 48.) Gernatt purchased a baghouse from Astec in 1984 and installed it that year at Gernatt's asphalt plant in Collins, New York (the "Collins Plant"). (*See* Doc. 70-2 ¶¶ 2, 36–37.) The Collins Plant baghouse is depicted at Document 72-5. A view of the baghouse with other parts of the plant labeled appears on page 8 of Document 70-24.

3

The baghouse includes three hopper (or dust) screws and one cross (or crossover) screw. (*Id.* ¶ 56.) The crossover screw (or auger) is in a trough at the bottom of a rectangular enclosure; an "inspection" or "access" door (or plate) on the enclosure can be opened to reveal part of the crossover screw. (*See* Doc. 72-21 (view from outside the enclosure showing inspection door in place); Doc. 71-9 (view from inside the enclosure with inspection door removed); Doc. 70-24 at 13 (view from outside with door removed); Doc. 70-24 at 14 (same, looking down at screw from above).) The access door is secured with bolts and nuts; opening the door requires use of a wrench or a socket and a ratchet. (Doc. 70-14 at 43.)

Mr. Rebmann began his employment with Gernatt as a part-time laborer in June 2015 after applying for the job through his great uncle, Dan Gernatt, Jr. (Doc. 70-12 at 34–35.) He sustained workplace injuries before the injury on March 19, 2020, including an injury to his left index finger, an injury in 2017 while using hydraulic shears, and an injury to his right eye while drilling a hole in a metal skimmer in 2019. (*Id.* at 28–29; Doc. 72-1.)

By January 2020, Mr. Rebmann had been promoted to assistant asphalt supervisor. (Doc. 70-12 at 110.) Mr. Rebmann's uncle Robert Rebmann was the asphalt supervisor and Mr. Rebmann's immediate supervisor. (*Id.* at 9, 108–111.) As part of an annual winter shutdown, the Collins Plant was offline in January 2020. (*Id.* at 109–110.) Mr. Rebmann went to the Collins Plant that month and joined the winter maintenance crew, which included Matt Fageol. (*Id.* at 112.)

Mr. Rebmann worked on the baghouse in the week before the incident of March 19, 2020. (*Id.* at 134.) It was his understanding that the dust from the baghouse had not been completely discharged at the end of the prior operating season. (*Id.*) Mr. Rebmann's uncle instructed him to get the dust out of the baghouse, telling him that to accomplish that task it was

4

necessary to "get the screws moving." (*Id.* at 137–138.) Mr. Rebmann understood that to mean that the team was required to "[t]ake the plugs out from underneath the bottom . . . [a]nd try to bump the screw conveyor to get the dust to break loose and start falling out of the plug." (*Id.* at 139–140.)

To "bump" the conveyor, one person would be in the control house to "bump" the button to energize the screws "for a split second," and another person would be on the end of the screw "to manually attempt to rotate it with the bump." (*Id.* at 147–148.) The control buttons are pictured at Document 72-11. The buttons would not energize the associated machinery if the breaker for the machinery was off; the breakers appear at Document 72-8 with lockout-tagout ("LOTO") devices. Mr. Rebmann participated in the "bump" procedure, either in the control house, at the end of the screw, or as an observer. (Doc. 70-12 at 150.) The team eventually got the screws moving. (*Id.* at 151.)

On March 9, 2020—either during the "bump" procedure or in connection with some other work at the baghouse— Gernatt fabrication shop foreman John Enser saw Mr. Rebmann and two other Gernatt personnel near the open baghouse access door with the screws energized. (Doc. 70-14 at 131–135.) He "didn't like" what he saw, particularly because Mr. Rebmann was only about two feet from the access door. (*See id.* at 132, 134.) Mr. Enser testified that he "yelled to all three of them, what are you guys doing?" (*Id.* at 136.) According to Mr. Enser, Mr. Rebmann then "kind of looked at me and took off," and Mr. Enser proceeded to ask the other two workers: "do you guys got things locked out, tagged out?" (*Id.*) Mr. Enser advised them that their conduct was dangerous. (*Id.* at 137.) He also reported the incident to Gernatt's safety director and vice president of engineering, Salvatore Dicembre, the next morning. (*Id.* at 138.) Mr. Dicembre "just said okay . . . [a]nd that was the end of it." (*Id.*)

5

After completing the "bump" procedure, the team found an issue with the gearbox on the crossover screw, and also noticed issues with the bearings on the dust screws. (*See* Doc. 70-12 at 151–152.) Approximately a week before the March 19 incident, the team had the inspection door open so that they could replace the bearings. (*Id.* at 162–163.) Mr. Rebmann completed the replacement of the bearings without incident. (*Id.* at 172.) During the replacement process, Mr. Enser looked through the open inspection door while the screws were energized and turning to verify proper rotation of the screw with the replaced bearing. (Doc. 70-14 at 82.) Mr. Enser asserts that he did so safely because he "had controls in place that nobody would get hurt." (*Id.*)

Replacing the bearings required Mr. Rebmann to reach inside the inspection door[1] (the screw was not energized at the time), and in doing so he observed a wear mark on the crossover screw. (Doc. 70-12 at 158–159, 172.) Mr. Rebmann brought the wear mark to the attention of his uncle, Robert Rebmann, who agreed that the screw needed to be removed and repaired. (*Id.* at 337.) Approximately three days before the March 19 incident, Anthony Rebmann and Mr. Fageol removed the crossover screw so that it could be repaired. (*Id.* at 173–174.) The plant's fabrication shop fixed the worn spot on the crossover screw, and Mr. Rebmann and Mr. Fageol reinstalled it. (*Id.* at 176–177.) On March 18—the day before the injury—Mr. Rebmann had in mind a plan to inspect the repaired and reinstalled screw. (*Id.* at 189.) The inspection door remained open during this time.

On the morning of March 19, before the accident, Mr. Rebmann and his uncle Robert Rebmann were both at the Collins plant. (Doc. 71-5 at 109.) Robert Rebmann testified that in a conversation with Anthony Rebmann at that time the two men discussed "clearing the bag

---

[1] This evidence is one possible answer to Plaintiff's inquiry at the May 2026 hearing as to why there was any need for an access door in the first place.

6

house." (*Id.* at 114.) Anthony Rebmann testified that he could not recall what he discussed with his uncle or with Mr. Fageol that morning. (Doc. 70-12 at 189.)

Mr. Rebmann testified that he needed the inspection door open "[b]ecause I had to inspect to make sure our work was done correctly." (*Id.* at 179.) He went alone to the drum plant control room, removed the LOTO locks from the equipment that he needed to operate, and started up the dust blower, the crossover screw, and the dust screw. (*Id.* at 192–193.) He then walked to the area of the baghouse inspection door. (*Id.* at 193–194.) No one else was present in the control tower or in the area. (*Id.* at 198.)

Mr. Rebmann crouched down so he could fit underneath the main structure of the baghouse. He had a flashlight in his right hand. (*Id.* at 195.) He testified that he was in approximately the same position as the individual pictured at deposition Exhibit 36 (Doc. 71-9). As he approached, he could see the top of the screw; he knew that the screw was rotating. (Doc. 70-12 at 212.)

To see the spot that had been repaired, he had to peer through the inspection door, down and to the left. He testified that "somewhere in the process of that[,] of me just trying to maintain stabilization[,] my [left] hand ended up in the screw." (*Id.* at 195.) Contact with the screw resulted in injuries to Mr. Rebmann's left hand. He went to the batch house control room and was ultimately transported to a hospital, where he underwent surgery; he lost his left middle, ring, and pinky fingers, and required surgical repair of his index finger. (*Id.* at 202, 213–214.)

## Summary Judgment Standard

"The summary judgment standards are well established." *Lewis v. Siwicki*, 944 F.3d 427, 431 (2d Cir. 2019). Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

7

law." Fed. R. Civ. P. 56(a).  When reviewing a motion for summary judgment, a court must "constru[e] the evidence in the light most favorable to the non-moving party and draw[] all reasonable inferences in [its] favor." *Edwards v. Arocho*, 125 F.4th 336, 346 (2d Cir. 2024) (quoting *Williams v. N.Y.C. Hous. Auth.*, 61 F.4th 55, 68 (2d Cir. 2023)).  "[I]f a movant meets his or her burden by introducing evidence sufficient to establish an affirmative defense, the nonmovant must introduce evidence to establish that a genuine dispute of material fact exists." *Conn. Ironworkers Emps. Ass'n, Inc. v. New England Reg'l Council of Carpenters*, 869 F.3d 92, 99 (2d Cir. 2017).

### Analysis

One of Astec's arguments in support of summary judgment is its contention that Mr. Berry's testimony should be excluded and that Plaintiff cannot meet his burden without that testimony.  (Doc. 70-1 at 11.)  Astec's summary judgment motion also relies in part of the opinion of its expert, Mr. Brickman (*see id.* at 19), whose testimony Plaintiff seeks to exclude or limit.  The court therefore begins with the motions related to the experts.

## I.    Motions to Strike, Exclude, or Limit Expert Reports or Testimony

Because the motions relating to expert reports or testimony invoke Federal Rule of Evidence 702, the court begins with the applicable legal principles.  Rule 702 and the Supreme Court's interpretation of that rule in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, assign the district court "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); *accord Restivo v. Hessemann*, 846 F.3d 547, 575 (2d Cir. 2017).  Under the applicable rules, evidence is "relevant" if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."

8

Fed. R. Evid. 401. This "basic standard of relevance . . . is a liberal one." *Daubert*, 509 U.S. at 587.

As to reliability, courts consider a variety of factors, including "the theory's testability, the extent to which it has been subjected to peer review and publication, the extent to which a technique is subject to standards controlling the technique's operation, the known or potential rate of error, and the degree of acceptance within the relevant scientific community." *Restivo*, 846 F.3d at 575–76 (internal quotation marks omitted). These factors are not "a definitive checklist or test." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999). "[W]hether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Id.* at 153.

The same principles "appl[y] not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Id.* at 141; *accord Restivo*, 846 F.3d at 576. Still, courts recognize that certain other considerations are often more illuminating in the context of "seemingly recalcitrant technical subjects such as engineering." *Milanowicz v. The Raymond Corp.*, 148 F. Supp. 2d 525, 531 (D.N.J. 2001). Those considerations may include applicable federal design and performance standards, independent standards organizations, relevant literature, industry practice, charts and diagrams, scientific testing, the feasibility of the suggested modification, and a risk-utility analysis. *Id.* at 533. Astec's motion focuses primarily on the traditional *Daubert* factors, but several of the additional considerations listed in *Milanowicz* also make an appearance as the analysis proceeds.[2]

---

[2] The court rejects any attempt to apply a "rigid schematization of scientific method" to any of the expert testimony in this case. *See George v. Ford Motor Co.*, No. 03 Civ. 7643, 2007 WL 2398806, at \*2 (S.D.N.Y. Aug. 17, 2007) (citing *Milanowicz*, 148 F. Supp. 2d at 532).

9

### A.    Thomas Berry, P.E. (Doc. 75)

Plaintiff has retained Thomas Berry, P.E., as an engineering expert in this case. Mr. Berry has opined that Astec "knew or should have known of technically and economically feasible design alternatives that would have significantly reduced and/or eliminated the risk to operators without unnecessarily affecting the utility of the [baghouse] machine." (Doc. 70-21 at 18.) Mr. Berry suggested four design alternatives: (1) design the access doors "with clearance between the access door opening and the nip/shear point"; (2) "[p]rovide bars across the lower area of the access opening"; (3) provide an interlock system "such that the augers could not operate with the access doors open or a grate guard in place" to prevent contact with the running auger that would "still allow the dust to escape during the clearing operation and would allow visual inspection of the augers and shafts"; and (4) install safety signs at each access door. (*Id.* at 19–20.)

Astec has moved to exclude Mr. Berry's opinions regarding causation and alternative designs, arguing that he "failed to properly test and validate his opinions, basing them instead on unsupported assumptions." (Doc. 75 at 6.) More specifically, Astec asserts that: (A) Mr. Berry's opinions improperly fail to rely on standards or technology in existence when Astec manufactured or sold the baghouse in 1984; (B) he has not tested any of the purported alterative designs; (C) he has not "meaningfully" considered the cost associated with the alternative designs; and (D) he has provided no evidence that the alternative designs could have prevented Mr. Rebmann's injuries. (*Id.* at 10–23.) Plaintiff opposes Astec's motion. The court begins by analyzing Astec's first argument about the standards and technology that existed in 1984. The court then considers the remaining arguments with respect to each of the alternatives in Mr. Berry's report.

10

Plaintiff appears to concede that the inquiry into the asserted defect(s) in the Astec baghouse must proceed with reference to the knowledge available at the time that the product was manufactured. *See Fane v. Zimmer, Inc.*, 927 F.2d 124, 128 (2d Cir. 1991) (courts evaluating design defect must determine whether, "if the design defect were known *at the time of manufacture*, a reasonable person would conclude that the utility of the product did not outweigh the risk inherent in marketing a product designed in that manner.'" (emphasis added; quoting *Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 108, 463 N.Y.S.2d 398, 402, 450 N.E.2d 204, 208 (1983))); *see also Hilaire v. DeWalt Indus. Tool Co.*, 54 F. Supp. 3d 223, 252 (E.D.N.Y. 2014) ("In establishing a design defect, the plaintiff must show that there was an economically and technically feasible alternative design available *at the time the product was manufactured*." (emphasis added)). Similarly, for strict products liability claims, the issue is "the design of the product in light of the state of the art *at the time of production*." *Voss*, 49 N.Y.2d at 111 (emphasis added).

Mr. Berry's report recognizes that the manufacturer shipped the baghouse at issue in this case in March 1984. (Doc. 70-21 at 2.) But the report does not include any detailed discussion of industry standards or technology from the 1980s. For the reasons that follow, the court is not persuaded that this is a basis to exclude Mr. Berry's opinions.

Astec cites two post-*Daubert* decisions for its contention that courts in products-liability cases will exclude expert opinions if the opinions are not related to the technology of the industry at the time the product was manufactured. The plaintiff in *Solorio v. Asplundh Tree Expert Company* brought negligence, strict-liability, and breach-of-warranty claims against the manufacturer of an aerial lift, made in 1978, after the cables of the lift broke in 1999 while the plaintiff was aloft in the bucket trimming trees. No. 02 Civ. 8035, 2009 WL 755362, at *1

11

(S.D.N.Y. Mar. 23, 2009). The defendant challenged the admissibility of plaintiff's proposed expert, who had knowledge and experience in wire rope analysis. The court excluded the expert's testimony, in part because he failed to "point to any alternative designs that existed in the marketplace *during the relevant time.*" *Id.* at *3 (emphasis added). But *Solorio* is distinguishable because the purported expert offered no alternative designs whatsoever. *See* Exhibit P, *Solorio*, No. 02 Civ. 8035 (S.D.N.Y. Feb. 15, 2008), ECF No. 38-27.

Astec also relies on *Redmond v. Teledyne Landis Machine*, No. 15-cv-00646, 2017 WL 2465173 (N.D.N.Y. June 7, 2017). The plaintiff in that case was a machinist who brought negligence, strict-liability, breach-of-warranty, and other claims against the manufacturer of pipe cutter machine originally made in 1956, arising out of a 2012 workplace injury where the plaintiff's left thumb was severed while operating the machine. The defendant challenged the admissibility of plaintiff's proposed expert, whose report included an opinion that the pipe cutter could have been designed with a guard in the area of operation, and that such a design was economic and feasible because a guard was added to the machine after the 2012 accident. *Id.* at *7. But the report did not mention "whether it was feasible *at the time of manufacturing* to include a guard on the Pipe Cutter." *Id.* at *7 (emphasis added). The report lacked any opinion "regarding the costs of including such guarding . . . or whether guarding such machines had even been implemented" in 1956. *Id.*

*Redmond* is distinguishable. Mr. Berry asserts that his report is based on safety design engineering "that has been recognized at least since the mid 1940's" and "well before this asphalt plant/baghouse was designed or manufactured." (Doc. 70-21 at 8–9.) And one of Mr. Berry's proposed alternative designs specifically indicates that it would comply with a 1984 standard: American National Standards Institute (ANSI) standard B20.1-1984. (*Id.* at 12.) The

12

court concludes that Mr. Berry's opinion is not lacking in the way that the reports in *Solorio* and *Redmond* were.

The parties disagree as to whether ANSI B20.1-1984 applied at the time the baghouse was manufactured.[3]  That standard applies to the "design, construction, installation, maintenance, inspection, and operation of conveyors and conveying systems in relation to hazards." (Doc. 85-8 at 10.)  "Conveyors" are defined in part as devices "for moving or transporting bulk material . . . in a path predetermined by the design of the device," but the definition excludes "integral machine transfer devices." (*Id.* at 11.)  The standard includes the following provisions:

> *5.2 Maintenance (Repair)* . . . (c) No maintenance shall be performed when a conveyor is in operation except as outlined in 5.3 and 5.4. . . .
>
> *5.4 Adjustment or Maintenance*  When adjustment or maintenance is required while equipment is in operation, only trained and qualified personnel who are aware of the hazard shall be allowed to make the adjustment. . . .
>
> *5.9.3 Guarding of Nip and Shear Points.*  In general, nip and shear points shall be guarded unless other means to assure safety are provided.  See Section 6 for specific conveyors. . . .
>
> *6.12 Screw Conveyors* . . .
>
> *(a)*  Screw conveyors shall not be operated unless the conveyor housing completely encloses the conveyor moving elements, and power transmission guards are in place, except as provided in (b) and (c) below.
>
> *(b)*  If the conveyor must have an open housing as a condition of its use and application, the entire conveyor is then to be guarded by a railing or fence, unless guarded by location.
>
> *(c)*  Feed openings for shovel, front end loader, or other manual or mechanical equipment shall be constructed in such a way that the conveyor screw is covered by grating.  If the nature of the material is such that a grating cannot be

---

[3] The copy of ANSI B20.1-1984 that appears in the record indicates that it was issued on May 31, 1984—after the March 1984 date on which the baghouse was shipped.  (Doc. 85-8 at 3.)  To the extent that a previous version of the standard applied when the baghouse was manufactured, Astec does not appear to argue that the previous version was materially different from the 1984 version.

13

used, then the exposed section of the conveyor is to be guarded by a railing and there shall be warning signs posted.

(Doc. 85-8 at 15–16, 21.)  Although the standard does not discuss inspection doors for screw conveyors specifically, the standard does reference doors and inspection doors for other types of conveyors, and recommends interlocking mechanisms and warning signage.

Because ANSI B20.1-1984 specifically excludes "integral machine transfer devices" from the definition of a conveyor, the standard would not apply to the baghouse's crossover screw if that component were an "integral machine transfer device."  ANSI B20.1-1984 does not include a definition of an "integral machine transfer device," but ANSI provided an interpretation in 1987 stating that "integral machine transfer device refers to any device designed as an integral part of a machine to move a product or part from one location or position to another."  (Doc. 70-25 at 10.)  That interpretation further stated that "farm machinery and harvesting equipment, automatic bowling pin setting machines, [and] road paving machines" each "could be equipment utilizing 'integral machine transfer devices.'"  (Id.)

Plaintiff argues that the 1987 ANSI interpretation does not mention "baghouses." (Doc. 85-13 at 9.)  That is true, but the interpretation would not need to list every possible machine that could include devices qualifying as "integral machine transfer devices."[4]  Plaintiff alternatively argues that even if the 1987 interpretation excluded baghouse crossover screws, that would be irrelevant because the 1987 interpretation was not published until three years after the date that the baghouse was manufactured.  (Doc. 85-13 at 9.)  Astec maintains that the 1987

---

[4] Plaintiff has not argued that the material moved within a baghouse—emissions and dust—might not qualify as a "product or part" under the 1987 interpretation.  However, Mr. Rebmann testified that the dust collected at the baghouse is taken back into the plant. (Doc. 70-12 at 71.)  To the extent that the dust is waste or by-product from one part of the manufacturing process, it appears to also be recycled into the final product at a different stage of the process.

14

interpretation is relevant "because it clarifies that integral machine transfer devices . . . *were always* exempt." (Doc. 93 at 7.) The court agrees with Astec on this point.

At the same time, the court concludes that much of this dispute is merely academic. Even assuming that the baghouse crossover screw was not an "integral machine transfer device," the sections of the standard that Mr. Berry quotes all appear to be for specific conveyors *other than* screw conveyors. (*See* Doc. 70-21 at 12–13.) Moreover, the cited sections all refer to measures that "should" (not "shall") be implemented. (*See* Doc. 85-8 at 14 (definitions of "shall" and "should").) If ANSI B20.1 even applied to baghouse screw conveyers, the provisions of that standard in 1984 said very little about safety measures for inspection doors on screw conveyors, and the measures that were cited were recommendations, not requirements.

Thus, the court does not read Mr. Berry's report as citing to ANSI B20.1 for the proposition that the standards in 1984 expressly imposed specific mandatory requirements for inspection doors on baghouse screw conveyors. Instead, Mr. Berry's reference to ANSI B20.1 must be read as asserting that those standards were informative for baghouse design choices in 1984. Mr. Berry makes a similar point in his supplemental report, stating that "there are no applicable safety standards to asphalt plants" and that "[t]here are only general standards that apply to parts of it, such as the auger." (Doc. 70-22 at 3.) *See also, e.g., Jaycox v. Terex Corp.*, No. 19-cv-02650, 2021 WL 2438875, at *4 (E.D. Mo. June 15, 2021) (expert testified that designers "must often look to 'equivalent' standards to determine what safety considerations they should incorporate into their designs"). ANSI B20.1-1984 shows that in 1984 the engineering community recognized a need for safety precautions for conveyors, and also recognized multiple available types of precautions including interlocks for doors; screens or gratings; and warning signage.

15

One alternative design that Mr. Berry suggests is installation of a "mesh type guard" behind the access door. (Doc. 70-21 at 11.) The report provides an illustration of such a guard, referring to a "Safe-Guard Chute Inspection Door" product. (*Id.* at 12.) The court accepts Astec's indication that this line of products, made by ASGCO and offered for sale in 2023, would not have been for sale in 1984. But Mr. Berry's reference to the ASGCO product is as an *example*; the court can infer that similar screen guards existed or could have been fabricated in 1984.

Another alternative design that Mr. Berry suggests is an interlock product that appears to be from 2018. (*Id.* at 17.) Again, the court accepts that this particular product did not exist in 1984. But the product depicted is merely an example; Mr. Berry's report describes it as such. (*See id.* ("Fig. 10 is an example of interlocks being installed on a screw conveyor.")) And ANSI B20.1-1984 mentions interlocks repeatedly, indicating that this technology was available at the time that Astec manufactured the baghouse.[5]

Astec also faults Mr. Berry for his reliance on the 11th edition of the National Safety Council's Accident Prevention Manual, which was not published until 1996. Mr. Berry cited that manual in support of his opinions that "[a]n operating procedure such as lock out/tag out failed to sufficiently address the hazard and risk" and that "methods for guarding and protecting the cross auger at the access opening were not exhausted or even addressed by design or guarding." (Doc. 70-21 at 15–16.) The court concludes that the citations to the 1996 manual are useful for rhetorical force, but not essential to Mr. Berry's opinions.

---

[5] Mr. Berry testified at his deposition that interlock technology "has been around for 70, 80 years." (Doc. 70-17 at 39.)

16

### 1.    Clearance Between Door and Nip/Shear Point

The first alternative design is to add "clearance between the access door opening and the nip/shear point created by the extremely small distance between the auger flighting and the housing." (Doc. 70-21 at 19.)  According to Mr. Berry, "[t]his could be accomplished by raising the edge of the access door opening or providing a grate guard for the lower area of the opening, or by utilizing a left-hand flighted screw that would move the nip area to the back of the auger rather than directly below the access opening."  (*Id.*)

### a.    Testing

As noted above, courts consider multiple factors in the "reliability" inquiry, including: "[1] the theory's testability, [2] the extent to which it has been subjected to peer review and publication, [3] the extent to which a technique is subject to standards controlling the technique's operation, [4] the known or potential rate of error, and the degree of acceptance within the relevant scientific community." *Restivo*, 846 F.3d at 575–76 (internal quotation marks omitted). Astec argues that the first factor is absent here because Mr. Berry failed to test any of his proposed alternatives. (Doc. 75-1 at 14.)[6] Citing *Milliman v. Mitsubishi Caterpillar Forklift America, Inc.*, 594 F. Supp. 2d 230, 240 (N.D.N.Y. 2009), Plaintiff maintains that "an expert is not required to test proposed design changes that are simple." (Doc. 85-13 at 10.)  Astec insists

---

[6] More generally, Astec asserts that Mr. Berry "fails to meet any of the four factors." (*Id.*)  On the second factor, Astec asserts that Mr. Berry's proposed alternatives were not subjected to peer review.  (*Id.*)  At his deposition, Mr. Berry conceded that he had not published any papers concerning design of the baghouse (and thus, implicitly, that no such papers underwent peer review).  (*See* Doc. 70-17 at 8.)  But lack of publication in a peer reviewed journal is "not dispositive" in the *Daubert* analysis. *Daubert*, 509 U.S. at 594.  Astec also contends that Mr. Berry's "lack of testing results in the failure of the third and fourth factors, because without testing, there can be no 'known rate of error' or showing of 'general acceptance' of the design." (Doc. 75-1 at 15.)  The court rejects the premise of that argument for the reasons discussed below.

that that the alternative designs at issue are not so simple, especially given that Plaintiff has retained an expert to offer testimony about the designs. (*See* Doc. 93 at 11.)

Initially, the court observes that the "testing" inquiry is not limited only to whether the expert did conduct tests. The inquiry also concerns whether the theory or technique "could be tested." *Baker v. Anschutz Exploration Corp.*, 68 F. Supp. 3d 368, 374 (W.D.N.Y. 2014). Here, Astec has not identified—and the court cannot discern—any reason why each of Mr. Berry's proposed design changes could not be tested.

In some cases, an engineer's proposed alternative design "do[es] not rise to the level of intricacy or scientific complexity requiring testing of his proposed design changes." *Milliman*, 594 F. Supp. 2d at 240. The plaintiff in *Milliman* was injured in a fall from a forklift-like "orderpicker" machine that the defendant manufactured. He was not wearing a safety harness, and no safety tether or harness was attached to the orderpicker. *Id.* at 235. The court concluded that the plaintiff's engineering expert could opine, without conducting testing, that the manufacturer should have made the machine with a permanently attached safety tether and harness. *Id.* The court reasoned that the expert's "extensive experience in biomechanics and mechanical engineering, coupled with the materials he reviewed and his interpretation of the applicable safety standards, constitute a reliable basis for his opinion." *Id.*

Here, the court concludes that Mr. Berry did not need to perform testing as to his alternative of raising the edge of the access door opening. Astec's expert has asserted that "[f]lighted screw augers typically have a close clearance with respect to their housing [because] otherwise, material builds up and does not adequately move near the housing interior structure." (Doc. 70-22 at 3.) That is sensible and understandable, but the housing in the area at issue appears to be rectangular, containing a cylindrical auger. With that geometry, the court

18

concludes that no testing would be required to support Mr. Berry's opinion that raising the lower edge of the access door opening could put the pinch/nip point beyond the reach of fingers when the hand is grasping the lower edge of the housing.

The court considers the grate guard below together with the question of the interlock. The court does not address testing of the left-handed flighting because the court agrees with Astec that this solution founders on efficacy grounds.

### b.    Cost

Astec asserts that Mr. Berry has failed to conduct a "meaningful" comparison of the cost versus utility of his proposed alternative designs. (Doc. 75-1 at 16.)  Plaintiff does not dispute the importance of cost in the analysis. *See, e.g.*, *Hilaire v. DeWalt Indus. Tool Co.*, 54 F. Supp. 3d 223, 244 (E.D.N.Y. 2014) ("In a products liability case, the 'touchstone' of an expert's report should be a comparison of the utility and cost of the product's design and alternative designs."). But Plaintiff maintains that the associated costs were zero, nominal, required by industry standards, or otherwise based on Mr. Berry's training, education, and experience. (Doc. 85-13 at 10–12.)  In reply, Astec insists that cost analysis is relevant, and that Mr. Berry has failed to provide "explanation, sources, or support for his assertions." (Doc. 93 at 11.)

As to cost, Mr. Berry asserts that raising the lip of the access opening could be provided "at no or little difference in cost." (Doc. 70-21 at 19.)  Absent special considerations that are not immediately apparent and that could be the subject of cross-examination, the court agrees that no further explanation or analysis is necessary for Mr. Berry's opinion that designing or cutting the port in the auger housing to place the lip of the access door at a higher point would carry little or no cost difference.

### c.    Efficacy

Astec also argues that Mr. Berry's report lacks evidence that the proposed alternative designs "could have prevented" Mr. Rebmann's injuries. (Doc. 75-1 at 16.) Plaintiff maintains that the standard is not whether the design would have "prevented" the injury, but whether the design would have resulted in greater safety. (Doc. 85-13 at 13.) Astec does not appear to dispute that this is the standard. Indeed, Astec quotes *Zaremba v. General Motors Corp.*, 360 F.3d 355, 359 (2d Cir. 2004), for the proposition that the expert must establish that the "hypothetical design would have resulted in greater safety." Astec's argument is that the proposed alternative designs would not have improved safety at all. *See, e.g., Urena v. ConAgra Foods, Inc.*, No. 16-CV-5556, 2020 WL 3051558, at *9 (E.D.N.Y. June 8, 2020) (proposed alternative design that would have made "no actual difference" could logically not be "a safer alternative"). The court considers that argument as to each of Mr. Berry's proposed alternatives.

The court agrees with Astec that designing the crossover screw with left flighting instead of right flighting would not have been materially safer. Mr. Berry asserts that the change "would move the nip area to the back of the auger." (Doc. 70-21 at 19.) It appears to the court, however, that the change would only alter where along the inspection door's horizontal opening the nip/shear areas at the front of the augur occurred. Maybe there would have been no nip/shear area in the exact location that Mr. Rebmann put his fingers in this particular case, but as a practical matter there would still be nip/shear areas at the front of the augur posing the same risk of injury.

Raising the lower edge of the inspection door opening, however, does not suffer from the same problem. Astec correctly observes that Mr. Berry's supplemental report recommends raising the edge by "a few inches" (Doc. 70-22 at 4), which is not a particularly precise

20

specification. And if "a few inches" means just two or three inches, then Astec may be correct that the modification would not eliminate the risk of entanglement for a hand grasping the bottom edge of the inspection door opening. (*See* Doc. 70-25 at 17–18.) But the court is not persuaded that Mr. Berry needed to calculate precisely how many inches the edge would have to be raised.[7] It is apparent from the layout and geometry of the inspection door opening that raising the bottom edge by *some* number of inches—more than two but less than half the height of the inspection door opening—would put the nip/shear point more than a finger's length away. Cross examination can reveal whether a smaller inspection door opening might impede operation, maintenance, or inspection of the crossover screw.

### 2. Bars on Lower Area of Access Opening, or Grate

#### a. Testing

Similar to the alternative of raising the bottom edge of the inspection door opening, the court concludes that Mr. Berry did not need to test the alternative of adding bars across the lower area of the access opening. This solution is functionally identical to raising the edge of the door opening. The main difference is that that lower area of the access opening would be covered with parallel bars instead of solid metal.

#### b. Cost

Like the alternative of raising the bottom edge of the inspection door opening, Mr. Berry asserts that the cost of adding bars would be low; in his view, "less than $10–15." (Doc. 70-21 at 19.) Astec maintains that Mr. Berry's cost estimate should be excluded for lack of any "meaningful explanation." (Doc. 75-1 at 16.) The court is not persuaded that more explanation

---

[7] He asserted at his deposition that his alternative design would require "4 inches at least clearance down to the hazard point." (Doc. 70-17 at 36.)

is required; the proposed alternative design appears to involve ordinary components that could be incorporated into the inspection door opening at modest cost.

### c.    Efficacy

Similar to raising the bottom edge of the inspection door opening, adding a sufficient number of bars at the lower area of the opening would put the nip/shear point more than a finger's length away. Astec argues that dust accumulation in the area would prevent visibility through the bars. (Doc. 75-1 at 15.) At his deposition, Mr. Berry conceded that dust accumulation between the bars would obstruct visibility if the bars were not cleaned off. (Doc. 70-17 at 38.) Even if not cleaned off, the alternative design is for bars only on the lower area of the access opening; the upper area would still offer views into the enclosure. The court concludes that Mr. Berry can testify to the bars as an alternative design. Cross examination can reveal whether adding the bars might impede operation, maintenance, or inspection of the crossover screw.

### 3.    Interlock

#### a.    Testing

As stated above, Mr. Berry's third proposed alternative design would be to provide an interlock system "such that the augers could not operate with the access doors open or [without] a grate guard in place" to prevent contact with the running auger that would "still allow the dust to escape during the clearing operation and would allow visual inspection of the augers and shafts." (Doc. 70-21 at 19.) He asserted at his deposition that "there wasn't a need for tests" as to interlocks. (Doc. 70-17 at 39.) He stated that it interlocks are "common technology that's been around for 70 years." (*Id.*)

22

There appears to be no dispute that interlock technology existed at the time the baghouse was designed and manufactured in the 1980s. But Astec asserts that Mr. Berry should have conducted testing to determine whether such a device "would work on the Baghouse." (Doc. 75-1 at 15.) The court agrees that adding an interlock device would be a "more substantial modification" to the Baghouse, *Milliman*, 594 F. Supp. 2d at 241, and that the practicality and specifics of installation of an interlock depends on the machine to which it would be applied. *See id.* (noting that some machines to which interlocks might be applied are "entirely different" from others). Although it appears that it would at least be possible to conduct testing of an interlock system applied to the Baghouse, the court concludes that the lack of any testing or modeling weighs somewhat against admission of Mr. Berry's opinions on the interlock design.

### b. Cost

In his report, Mr. Berry asserts that integrating "interlocked doors and grate guards" into the Baghouse would cost "approximately $200 per opening." (Doc. 70-21 at 19.) Astec maintains that Mr. Bery "gives no explanation, sources, or support" for that assertion. (Doc. 75-1 at 16.) The court agrees with Astec that further support is necessary for Mr. Berry's price estimate because the cost estimate must consider more than purchase price. As in *Milliman*, it is necessary to establish a "reliable basis for determining the cost of *installing and implementing* such a device" in the Baghouse. *Milliman*, 594 F. Supp. 2d at 241.

Plaintiff has an alternative argument, however. He contends that the 1980 Conveyor Equipment Manufacturers Association (CEMA) industry manual required interlocks, and thus an inquiry into cost "is not necessary." (Doc. 85-13 at 12.) Some portions of the CEMA manual appear at Document 85-11, but those excerpts do not discuss interlocks. More importantly, Astec notes that CEMA is "an industry group not focused on regulation (or authorized to

23

regulate) but on voluntary standardization of conveyor design." (Doc. 93 at 9.) Even assuming that the CEMA manual purported to require interlocks for applications like the Baghouse, the manual would not constitute regulatory or binding authority. Thus, the cost of an interlock system remains relevant to the reliability inquiry.

### c.    Efficacy

Perhaps the most important consideration as to the interlock design is whether it would improve safety without negatively impacting maintenance and inspection. Mr. Berry and Mr. Rebmann both testified that Mr. Rebmann needed the crossover screw to be running while he was looking into the inspection door because he needed to determine whether the repair to the screw was successful. (*See* Doc. 70-12 at 179 ("I had to inspect to make sure our work was done correctly."); Doc. 70-17 at 22 ("[H]e needed to view the interaction between the bolt and the auger shaft.").)[8] Astec posits that because Mr. Rebmann "*wanted* the Baghouse to be running" as he made the inspection, "[i]t is utterly illogical for Berry to assume that Plaintiff would not have disabled an interlocking mechanism to achieve that goal." (Doc. 75-1 at 21.)

The court is unpersuaded on this point. If disabling the proposed interlock were the only way to accomplish the inspection, Plaintiff could argue that the time spent doing so could have called extra attention to the need for caution near the spinning auger. Moreover, disabling the interlock would not have necessarily been the only way for Mr. Rebmann to complete his task. One version of the interlock that Mr. Berry proposes is that it would prevent the augers from

---

[8] Astec's expert, Mr. Brickman, asserts that the running machine would have caused a "dust storm cloud" at the access door opening, which would have prevented Mr. Rebmann from seeing the area at issue. (Doc. 70-24 at 20.) This is, at best, a factual dispute. Mr. Rebmann testified that he was able to see the top of the turning screw before he approached it. (Doc. 70-12 at 212.) Robert Rebmann testified that "[n]othing" happens to the dust when the access door is open and the blower is on. (Doc. 84-10 at 79.)

24

operating unless a grate guard was in place.  In that scenario, Mr. Rebmann would likely have simply replaced the grate guard, rather than attempting to disable the interlock mechanism.[9]  The court concludes that all of these questions about testing, cost, and efficacy of an interlock system are suitable for cross-examination but are not a basis to exclude Mr. Berry's testimony on that alternative.

### 4.    Safety Signs

There appears to be a dispute about whether Astec supplied safety signs on or near the inspection door when the product was delivered to Gernatt in 1984.  No warning signs or labels are visible on or near the inspection door in the contemporaneous photographs.  However, Astec Vice President George Francisco testified in 2024 that he worked for Astec for over 31 years, and that in his experience during that time, Astec would affix warning labels to areas like the inspection door on the baghouse at issue in this case.  (*See* Doc. 70-13 at 22, 169.)  Although the 31-year time period does not reach as far back to 1984, Mr. Francisco's testimony is some evidence that could support a conclusion that Astec did supply the product with warning labels. Their absence at the time of the 2020 injury could be explained by the passage of time and the effects of vibration and dust.  Still, at this stage, the court is required to draw all reasonable inferences in Mr. Rebmann's favor, and the court can reasonably infer that the baghouse lacked safety signs in 1984.

### a.    Testing

Astec's arguments about the proposed addition of safety signs or warning labels do not appear to include a lack-of-testing criticism.  In the context of warning labels, the testing that is

---

[9] Whether the grate guard might have prevented a view of the area that Mr. Rebmann needed to inspect would be a question for cross-examination.

often most relevant involves "creating several warning labels that varied with respect only to a single characteristic and then gauging peoples' reactions to the various labels." Sara K. Ledford, Note, *The Implications of* Kumho Tire: *Applying* Daubert *Analysis to Warning-Label Testimony in Products Liability Cases*, 76 Ind. L. J. 465, 480 (2001). Here, in contrast, the inquiry is only the presence or absence of any warning labels at all. Testing might be helpful to determine how long a safety sign would remain attached or visible in a dusty and vibrating environment, but the court does not conclude that such testing was necessary here.

### b.    Cost

Mr. Berry asserts that safety signs at each access door could have been provided "at a cost of less than $3 each." (Doc. 70-21 at 20.) Astec faults that assertion as unsupported by any explanation or sources. (Doc. 75-1 at 16.) The court concludes that no further support is required for the proposition that, at least compared to the total cost of a baghouse, industrial safety signs were relatively inexpensive in the 1980s. Whether special adhesion or paint might be required for equipment in a dusty and vibrating environment would be fair game for cross examination.

### c.    Efficacy

Astec contends that "there is a complete absence of factual support for Berry's conclusion that the alleged failure to warn was a proximate cause of Plaintiff's injuries." (Doc. 75-1 at 21.) Astec cites Mr. Berry's testimony stating that he agreed that "it's reasonable to expect that [warnings on equipment] [are] not going to be read." (Doc. 70-17 at 28.) Plaintiff counters that "the general concept that not all warnings are followed, does not negate Astec's responsibility to adequately warn." (Doc. 85-13 at 14.) The court agrees with Plaintiff on this point; safety signs and placards have long been established as "result[ing] in greater safety."

*Zaremba*, 360 F.3d at 359; *see also, e.g., Manzo v. Stanley Black & Decker, Inc.*, No. 13-CV-3963, 2024 WL 5319230, at *13 (E.D.N.Y. Mar. 20, 2024) (admitting expert opinions regarding insufficiency of warnings, in part because multiple safety regulations, standards and guidance required warning labels). The court's reasoning below as to Astec's motion to exclude Plaintiff's products-warnings expert, Dr. Goldhaber, supports this conclusion.

For the reasons discussed above, the court will grant Astec's motion to limit Mr. Berry's testimony as to switching the auger from right-hand to left-hand flighting. The motion to strike, exclude, or limit Mr. Berry's testimony is otherwise denied.

### B.   Gerald Goldhaber, Ph.D. (Doc. 74)

Dr. Gerald Goldhaber produced his initial report in this case on August 8, 2024. (Doc. 70-19.) He produced a report in response to Astec's experts' reports (Doc. 85-12 at 85), and a supplemental report in response to Astec's supplemental expert reports (*id.* at 93). He also provided testimony at a deposition on January 30, 2025. (Doc. 70-18.)[10] Dr. Goldhaber's August 2024 report includes four numbered opinions:

Opinion 1: What is a Warning?

Opinion 2: Astec, in all likelihood, was aware of the hazard of a missing maintenance door leading to a rotating screw auger on Astec's Baghouse and failed to warn about this hazard.

Opinion 3: Astec should have and could have provided adequate warnings about the rotating parts hazard behind Astec's missing access doors.

---

[10] Dr. Goldhaber also submitted a "supplemental report" dated February 10, 2025 (Doc. 69-3), which Astec asserts was untimely and prejudicial. (Doc. 96 at 7 n.2.) However, Astec has not filed a motion challenging the February 10 report, and the court is not here considering whether that report violated the discovery rules or whether any sanction is warranted.

> Opinion 4: If Astec had provided a warning, as recommended above, it is more likely than not that the accident to [Mr. Rebmann] on 3/19/20, resulting in the loss of three of his left hand's fingers, could have been prevented.

(Doc. 70-19 at 3, 5, 6, 8 (cleaned up).)

Astec asserts that Opinions 2–4 should be excluded as unsupported, arguing that: (1) Dr. Goldhaber's opinion that the incident would not have occurred with his warning in place is based on unsupported assumptions; (2) his opinion that Mr. Rebmann would have adhered to an additional warning contradicts Dr. Goldhaber's own testimony and writings; and (3) Dr. Goldhaber did not consider that the relevant warnings standard was not operative when the Baghouse was manufactured, or that the Baghouse likely had effective safety warnings when delivered to Gernatt. (Doc. 74-1 at 2.) Plaintiff opposes Astec's motion (Doc. 85-13), and Astec has filed a reply (Doc. 94).

### 1. "Unsupported Assumptions" on Effectiveness of Warnings

Astec contends that Dr. Goldhaber's opinions are "premised on the false narrative that Plaintiff was told to get close to the moving screw to check it." (Doc. 74-1 at 11.) Astec particularly challenges Dr. Goldhaber's statement at his deposition that Mr. Rebmann's supervisor told him "directly . . . that in order to accomplish that task that day, he needed to put aside his training, his background, or what you call his common sense." (Doc. 70-18 at 28.) The court agrees that the evidence does not support a finding that Mr. Rebmann's supervisor or anyone else specifically told him to perform the check or how to do so.

At his deposition, Dr. Goldhaber asserted that Robert Rebmann, Anthony Rebmann's uncle and immediate supervisor, directly ordered Anthony Rebmann to "first clean the dust out, and inspect those augers." (Doc. 70-18 at 28.) Dr. Goldhaber reiterated his view of Robert Rebmann's instructions, asserting that Robert Rebmann told his nephew "to do that"—i.e., to visually "inspect[] a moving, rotating screw auger." (*Id.* at 38.) Dr. Goldhaber quoted from

28

Anthony Rebmann and Robert Rebmann's deposition testimony to support his view that Robert Rebmann "instructed" Anthony Rebmann to inspect the auger while it was rotating. (*Id.* at 24–25.) Dr. Goldhaber specifically cited Robert Rebmann's statement at deposition agreeing that "in order to check and ensure that the screw on the hopper auger was not contacting the crossover auger, those augers had to be turning and in operation." (Doc. 71-5 at 197.)

The fact that Robert Rebmann agreed that the "check" required the augers to be turning does not prove that he expressly instructed Anthony Rebmann to perform the check. Based on its review of Robert Rebmann and Anthony Rebmann's testimony, the court agrees with Astec that there is no support for the proposition that Robert Rebmann expressly instructed to carry out a "check" or "inspection" of the repaired crossover screw (or how to perform that check). The court therefore agrees to limit Dr. Goldhaber's testimony insofar as he might opine that Mr. Rebmann received instructions to put aside his training, background, or common sense. This conclusion, however, does not require excluding Dr. Goldhaber's opinions Nos. 1–3.

Somewhat more relevant to those opinions is Astec's reliance on Robert Rebmann's testimony that he (and by extension, his nephew) did not "need to be told not to put [his] hand near" a rotating conveyor because they "already knew that." (Doc. 71-5 at 230.) Astec therefore contends that any warning signs or placards would have made no difference because Anthony Rebmann was "unequivocally aware of [the dangers]." (Doc. 74-1 at 12.) But Dr. Goldhaber's opinion does not presume that Mr. Rebmann was unaware of the danger. As discussed above, the inquiry is whether signage such as that proposed by Dr. Goldhaber "would have resulted in greater safety." *Zaremba*, 360 F.3d at 359. Mr. Rebmann testified that, in his view, such warnings "would have made me think about coming in close proximity a little bit more." (Doc. 70-12 at 341.) Dr. Goldhaber's opinion No. 4 is consistent with that testimony; as Dr.

29

Goldhaber opined, warning signage or placards "could increase the degree to which a product is perceived to be hazardous" and "[a]s perceptions of the hazardousness of a product increase, so does compliance with a warning increase." (Doc. 70-19 at 8.)

Astec has a further criticism about the factual basis for Dr. Goldhaber's report: Astec contends that his opinions "disregard that Plaintiff habitually ignored safety protocols, safety training and safety procedures." (Doc. 74-1 at 13.) The original report, dated August 8, 2024, does not discuss Mr. Rebmann's prior safety incidents. The court concludes that, at best, it is debatable whether Mr. Rebmann's prior workplace injuries and a verbal reprimand for failing to wear a hardhat show that he "habitually ignored" safety protocols, training, or procedures. In any case, Dr. Goldhaber has addressed Mr. Rebmann's prior safety incidents in the supplemental report. (Doc. 85-12 at 95.) To the extent that Mr. Rebmann's prior incidents might show any "tendency to ignore safety protocol" (Doc. 74-1 at 14), the court concludes that this is a topic for cross-examination, not a reason to exclude Dr. Goldhaber's opinions.

### 2. Dr. Goldhaber's Own Testimony and Writing on Effectiveness

Astec further argues for exclusion of Dr. Goldhaber's opinion about the effectiveness of warning signs or placards as being "in direct contradiction to his own testimony and work on the effectiveness of warnings." (Doc. 74-1 at 16–17.) Astec cites statements by Dr. Goldhaber in 2009, 2017, and, most recently, in 2020: "[T]he literature in my field has overwhelmingly concluded that most warnings fail to get either the attention of or compliance by their intended audience." (Doc. 70-25 at 42.) Similarly, Dr. Goldhaber stated at his deposition that "most people will ignore warnings." (Doc. 70-18 at 33.) Astec therefore asserts that Dr. Goldhaber "offers the jury no conclusion as to the reasonable likelihood for his opinion that Plaintiff is the outlier and would have been impacted by an additional warning" and that Dr. Goldhaber "should

30

be precluded from proffering the opinion that the lack of an additional warning was the proximate cause of the Incident." (Doc. 74-1 at 19.)

Plaintiff responds by referencing Dr. Goldhaber's points in his February 2025 supplemental report. Dr. Goldhaber wrote that, even though "warnings are not the most effective means to communicate hazards . . . this does not negate Astec's responsibility . . . to provide a conspicuous and adequate warning." (Doc. 85-12 at 95–96.) The court agrees that Dr. Goldhaber can testify that warning signage "would have resulted in greater safety." *Zaremba*, 360 F.3d at 359.

The issue of proximate causation is ordinarily a question of fact. *See Badilla v. Midwest Air Traffic Control Serv., Inc.*, 8 F.4th 105, 135 (2d Cir. 2021) (proximate cause "is ordinarily a question of fact for a jury"). Still, the rules generally permit an expert to offer opinions on such "ultimate issue[s]." Fed. R. Evid. 704(a). The court acknowledges that "failure to warn cannot be [the] proximate cause of [an] accident where a warning would not have increased the user's awareness of the danger." *Martins v. Sherwin-Williams Co.*, No. 22-cv-3520, 2023 WL 8788942, at *5 (E.D.N.Y. Dec. 19, 2023). And, as noted above, Mr. Rebmann was aware of the danger. He testified that he "understood that there was a hazard to the screw moving." (Doc. 70-12 at 104.)

However, the inquiry is not whether warning signage would have made the user aware of a danger of which they were previously unaware. The inquiry is whether a warning would have *increased* the user's awareness of the danger. Mr. Rebmann testified that if warning signs or labels had been present "it would have made me think about becoming—it would have made me think about coming in close proximity a little bit more." (Doc. 70-12 at 341.) A jury can assess that testimony, and the court will not exclude Dr. Goldhaber from offering similar testimony.

31

### 3.    Warnings Standards as of 1984

As discussed above, in applying *Daubert* to engineering opinions, courts often consider applicable government and industry design standards. *Milanowicz*, 148 F. Supp. 2d at 531. Dr. Goldhaber's report specifically faults Astec for failing to comply with ANSI Z535.4, which he asserts "has been in effect since 1968." (Doc. 70-19 at 8, 10.) Astec insists that "[i]n reality, the first version of the ANSI Z535.4 standard for product safety signs and labels was published in 1991, *seven years* after the Baghouse was manufactured and delivered to Gernatt." (Doc. 74-1 at 20.) Plaintiff maintains that ANSI Z35.1-1968 was approved in September 1968 and that the Occupational Safety and Health Administration (OSHA) "adopted this standard in 1971, requiring workplaces to comply with it starting August 31, 1971." (Doc. 85-13 at 18.) Astec insists that ANSI Z535.4 was not published until after the Baghouse was manufactured, and that Plaintiff failed to provide any source or citation for the proposition that OSHA adopted the standard in 1971. (Doc. 94 at 6–7.)

Astec cites a post on the ANSI website indicating that ANSI Z535.4's "initial publication" was in 1991—after the Baghouse was manufactured in 1984. Brad Kelechava, *The Significance of Product Safety Signs and Labels in ANSI Z535*, Am. Nat'l Standards Inst. (Feb. 9, 2017), https://blog.ansi.org/ansi/product-safety-signs-labels-ansi-z535/ [https://perma.cc/DLW9-L6S4]. The court accepts that as true, but Astec's argument on this point fails to account for the fact that ANSI Z535.4's predecessor is USAS Z35.1. *See Manzo*, 2024 WL 5319230, at *13 (noting that USAS Z35.1-1968 was later renamed ANSI Z535). And federal regulations incorporated the Z35.1-1968 standard in 1984. *See* 29 C.F.R. § 1926.200(*i*) (1984). Plaintiff's reference to August 31, 1971, appears to be with respect to the accident prevention signs and tags

32

regulation at 29 C.F.R. § 1910.145 (1984), which imposed specifications for new signs and replacements of old signs on or after that date.

For all of the above reasons, the court will deny Astec's motion to exclude Dr. Goldhaber's testimony.

### C.    Nadeem Hussain, M.D. (Doc. 66)

The earliest motion challenging an expert in this case is Astec's motion (Doc. 66) to strike the "Life Care Plan" (also styled "report") of Nadeem Hussain, M.D., dated November 8, 2024 (Doc. 66-7).  Astec contends that Dr. Hussain's report is "an improper rebuttal report and an improper supplemental disclosure under Federal Rules of Civil Procedure 26(a) and (e)." (Doc. 66-9 at 4.)  In particular, Astec argues that the report is "an entirely new report that fails to contradict, challenge, or rebut Defendant's corresponding report," and that it is "not based on any new or previously unavailable information that would trigger a duty for Plaintiff to supplement its report."  (*Id.*)  Plaintiff maintains that Dr. Hussain's report properly contradicts or rebuts the report of Astec's expert, Todd Stein, M.D., dated September 30, 2024 (Doc. 68-1), and that, in any case, preclusion would not be the appropriate remedy.  (*See* Doc. 68-4.)  In reply, Astec insists that Dr. Hussain's report is an improper sur-rebuttal report, and that the factors articulated in *Softel, Inc. v. Dragon Medical & Scientific Communications, Inc.*, 118 F.3d 955 (2d Cir. 1997), weigh in favor of preclusion.  (Doc. 69.)

The court begins by outlining the relevant background regarding the medical reports in this case.  By text order on December 4, 2023, the court set Plaintiff's deadline for expert disclosures as August 30, 2024, and set Defendants' deadline for expert disclosures as October 11, 2024.  (Doc. 57.)  Plaintiff produced expert disclosures on August 30, 2024, identifying six experts, including Mr. Berry and Dr. Goldhaber (discussed above), as well as

33

certified life care planner Linda Lajterman, R.N., a Senior Disability Analyst with Diagnostic Rehabilitation Services, LLC. (Doc. 66-2.) Plaintiff supplied a copy of a 10-page "Life Care Plan" for Mr. Rebmann authored by Ms. Lajterman and by Michael Lajterman, M.A., dated August 19, 2024. (Doc. 66-3.) As stated in the plan, the recommendations for medical services and supplies are "based on recommendations from [orthopedist] Dr. Jones, [prosthetics consultant] John Rheinstein, C.P., FAAOP(D) reported by Mr. Rebman, noted in the medical records and clinical practice guidelines." (*Id.* at 8.) The plan calculates total expenditures for Mr. Rebmann's future care as $2,756,871.00, comprised primarily of "Prosthetics and supplies" (approximately $1.9 million) and "Therapeutic Modalities" (approximately $340,000). (*Id.* at 13.)

On October 11, 2024, Astec timely submitted its expert disclosures, including a five-page report from Todd Stein, M.D., an orthopedic hand surgeon (Doc. 68-1). Dr. Stein's report lists the materials that he reviewed, provides a brief medical history, and includes diagnoses[11] and opinions on several topics, including an opinion that Ms. Lajterman's Life Care Plan "makes a number of conclusions with costs that are simply not realistic." (Doc. 68-1 at 3.) Dr. Stein challenged items from most categories in Ms. Lajterman's report. Regarding the most expensive categories—therapy and prosthetics—Dr. Stein opined that the recommended massage therapy was not medically necessary, and offered the following comments regarding prosthetics:

> The cost of prosthetic use would best be discussed with a prosthetist familiar with these devices. However, as a surgeon, I can comment that many patients discard upper extremity prosthetics due to weight, fitting and function. A recent article by Salminger et al in *Disability and Rehabilitation* issue of July 2022 stated that "Abandonment rates in prosthetic rehabilitation after upper limb amputation have

---

[11] Dr. Stein's two diagnoses are left-hand traumatic injury and left carpal tunnel syndrome ("CTS"). Dr. Stein opined that the traumatic injury is causally related to the incident of March 19, 2020, but that the CTS is not causally related to that event, but instead to Mr. Rebmann's "extreme weightlifting" activities. (Doc. 68-1 at 2–3.)

34

shown to be 50% and higher. The advances of the last decade in the arena of upper limb prosthetics have not yet achieved a significant change in prosthetic abandonment".

(*Id.* at 4.) Finally, Dr. Stein opined that, although Mr. Rebmann had sustained a "significant injury to his left hand," that "does not preclude him from having a functional life." (*Id.*)

Astec also disclosed a 23-page review of Ms. Lajterman's report authored by Kelly Lance, M.S.N. (Doc. 66-5.) Consistent with Dr. Stein's opinion, Ms. Lance revised the cost for massage therapy to $0, commenting: "Not medically necessary or related to the hand." (*Id.* at 17.) She also revised the costs related to a prosthetic and supplies to about $38,000, noting her agreement with Dr. Stein that many patients discard upper extremity prosthetics. (*Id.* at 20.)

On October 30, 2024, Plaintiff filed a consented-to motion seeking an extension of Plaintiff's "reply expert disclosures" to November 28, 2024. (Doc. 64 at 1.) Plaintiff's counsel explained that she sought the extension under Fed. R. Civ. P. 26(a)(2)(D)(ii) and Rule 26(e) "to avoid duplicative expert depositions, and the costs and time associated with having to take expert depositions without the benefit of the written reply and/or supplemental expert report(s)." (*Id.*) The court granted that motion in a text order dated November 5, 2024. (Doc. 65.)

On November 27, 2024, Plaintiff produced a "Supplemental Expert Disclosure" listing five experts, including Dr. Hussain, a "physiatry, rehabilitation, and life care planning expert." (Doc. 66-6 at 3.) Dr. Hussain's report cannot be faulted for excessive brevity—including the cover sheet and table of contents, it is 131 pages long. In a list of materials that he reviewed, Dr. Hussain noted that he considered the Lajterman "Life Care Plan"; Ms. Lance's review of that plan; and Dr. Stein's expert report. (Doc. 66-7 at 35.) Dr. Hussain also conducted his own interview and examination of Mr. Rebmann. (*Id.* at 36.) In his report, Dr. Hussein opined that "[t]he total nominal value of Mr. Rebmann's future medical requirements, as formulated in this

35

life care plan, and which pertain to his relevant diagnostic conditions and disabilities = $2,604,011.58." (*Id.* at 5.)

Similar to Ms. Lajterman's report, the predominating contributor to that sum is approximately $1.96 million for "Equipment & Supplies," including nearly $1 million for an "i-Digits Quantum Prosthesis." (*Id.* at 5, 73.) Both Ms. Lajterman and Dr. Hussain recommend therapies, but Dr. Hussain includes almost $46,000 for acupuncture. (*Id.* at 93.) Both professionals also recommend equipment and aids, but Dr. Hussain includes about $150,000 for a service dog. (*Id.* at 125.) By letter to Plaintiff's counsel dated December 5, 2024, counsel for Astec asserted that Dr. Hussain's report was "improper and untimely." (Doc. 66-8 at 2.)

### 1.   Dr. Hussain's Report as a Rebuttal Report

There is no dispute that Dr. Hussain's report cannot qualify as an initial expert disclosure. Plaintiff's deadline for initial expert disclosures was August 30, 2024, and Plaintiff submitted Dr. Hussain's report well after that date. Plaintiff has not sought a retroactive extension of time under Fed. R. Civ. P. 6(b)(1)(B) to submit Dr. Hussain's disclosure as an initial report. And the court's order of November 5, 2024, did not extend the deadline for initial expert reports, but granted Plaintiff an extension to produce "reply" expert disclosures. (Doc. 65.) Plaintiff also does not appear to contest Astec's assertion (Doc. 66-9 at 7) that Dr. Hussain's report cannot be a supplemental disclosure under Fed. R. Civ. P. 26(e). It therefore remains to consider whether to characterize Dr. Hussain's report as a "reply" (or rebuttal) report.

"Federal Rule of Civil Procedure 26 allows rebuttal expert testimony 'intended solely to contradict or rebut evidence on the same subject matter identified by another party.'" *In re Zimmer M/L Taper Hip Prosthesis or M/L Taper Hip Prothesis With Kinective Tech. & Versys Femoral Head Prods. Liab. Litig.*, No. 18-MD-2859, 2021 WL 1405185, at *2 (S.D.N.Y.

Apr. 14, 2021) (quoting Fed. R. Civ. P. 26(a)(2)(D)(ii)). "Rebuttal evidence is properly admissible when it will explain, repel, counteract or disprove the evidence of the adverse party." *Id.* at \*3 (quoting *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 44 (S.D.N.Y. 2016)). "But a rebuttal expert report is not the proper place for presenting new arguments, unless presenting those arguments is substantially justified and causes no prejudice." *Id.* (cleaned up). "Nor is a rebuttal report an opportunity to correct oversights in the party's case in chief." *Id.* The "court has wide discretion in determining whether to permit evidence on rebuttal." *Scott*, 315 F.R.D. at 44.

Here, Astec's opening brief characterizes Dr. Hussein's report as an improper attempt to rebut Ms. Lance's review of the Lajterman report; the brief does not mention Dr. Stein. In the opposition brief, Plaintiff argues that Dr. Hussein's report rebuts Dr. Stein's report. (Doc. 68-4 at 4.) According to Plaintiff: "Having received the Astec defendants' expert report, that included a doctor that opined on life care needs . . . plaintiff hired a physician to directly rebut them." (*Id.*) In support of that position, Plaintiff relies on *In re Zimmer*, a multi-district litigation against a prosthesis manufacturer ("Zimmer") alleging that Zimmer's multi-piece hip prosthesis was prone to metal release and corrosion, resulting in tissue necrosis and other injuries, including adverse local tissue reaction ("ALTR"). *See In re Zimmer*, No. 18-MD-2859, 2021 WL 3475681, at \*1 (S.D.N.Y. Aug. 6, 2021). In reply, Astec maintains that Dr. Hussain's report cannot be a reply to Dr. Stein's report, asserting that "Plaintiff improperly equates [Dr. Stein's] expert medical analysis to [Dr. Hussain's] expert life care plan and attempts to construe the reports as being of the same subject matter." (Doc. 69 at 7.)

After the *Zimmer* court decided to proceed with plaintiff Tamma Nutting's case as the first of four bellwether trials, Zimmer moved to strike the rebuttal report of the plaintiffs' expert

radiologist, Dr. Alissa J. Burge. Ms. Nutting did not disclose an expert radiologist initially, although she did disclose Dr. Richard Iorio, an orthopedic surgeon, who offered multiple opinions, including an opinion that failure to use metal artifact reduction sequencing ("MARS") in Ms. Nutting's MRI limited the ability to detect ALTR. Zimmer then disclosed Dr. Alice Ha, a radiologist who opined that the MARS protocol *was* used for Ms. Nutting's MRI, and that the MRI showed no signs of ALTR. In response to Dr. Ha's report, Ms. Nutting retained Dr. Burge, who opined that the MRI showed "some evidence of synovial thickening, which may or may not be evidence of ALTR." *Id.* The court declined to strike Dr. Burge's report, reasoning: "Plaintiffs chose not to disclose an expert radiologist initially, evidently because Plaintiffs place less weight on Ms. Nutting's MRI than Zimmer does, but once Zimmer disclosed an expert radiologist (Dr. Ha), Plaintiffs decided to retain Dr. Burge to rebut Dr. Ha's report." *Id.* at *5.

Somewhat similarly, Mr. Rebmann chose not to disclose a life-care physician initially, evidently reasoning that Ms. Lajterman's opinions were sufficient as to the medical necessity or utility of the medical products and services recommended in her report. Once Astec disclosed Dr. Stein's report criticizing portions of Ms. Lajtertman's opinion on issues of medical necessity or utility, Mr. Rebmann could properly retain a physician of his own to respond to those criticisms.

At the same time, Dr. Hussain's report does not offer much substance on the particular issues of medical necessity or utility. Regarding massage therapy, Dr. Hussain remarked that Mr. Rebmann "has found more relief at times" with massage (and other therapies or techniques) than with products like CBD cream, topical essential oils, and compressive wraps. (Doc. 66-7 at 37.) Dr. Hussain's report does not discuss Dr. Stein's statistical evidence of prosthetic abandonment, but does note that Mr. Rebmann expressed interest in prosthetic options at

38

appointments, and that he received advice that a prosthesis would "help in everyday tasks, increase [his] ability to more comfortably accomplish ADLs [activities of daily living], allow him to be more active at work, drive, and reduce wear and tear on the contralateral side." (Doc. 66-7 at 31.) Moreover, Dr. Hussain's report goes well beyond a narrow response to Dr. Stein's particular criticisms; instead, Dr. Hussain produced an entirely new life-care plan.

For these reasons, the court concludes that Dr. Hussain's report is partly a proper rebuttal and partly and improper new expert report. Insofar as the report violates the discovery rules, the court considers the *Softel* factors below.

### 2.    *Softel* Factors

Turning to the question of the proper sanction for failure to conform to the discovery rules, the court considers the so-called *Softel* factors:

> (1) the party's explanation for the failure to comply with the discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance.

*Softel*, 118 F.3d at 961 (citing *Outley v. City of New York*, 837 F.2d 587, 590–91 (2d Cir. 1988)). Mr. Rebmann contends that all four *Softel* factors weigh against striking Dr. Hussain's report. (Doc. 68-4 at 8–9.) Astec argues that all four factors weigh in favor of precluding Dr. Hussain's report. (Doc. 69 at 9–11.)

### a.    Plaintiff's Explanation

Plaintiff's explanation is that he offered Dr. Hussain's report "to contradict or rebut evidence on the same subject matter, specifically the medical opinions offered by Dr. Stein for the first time in October of 2024, that were than adopted by Ms. Lance." (Doc. 68-4 at 8.) Astec maintains that Dr. Hussain's report is not on "the same subject matter" as Dr. Stein's report, and

39

that Dr. Hussain's report does not "repel, counteract, or disprove" any of Dr. Stein's opinions. (Doc. 69 at 10.)

As this court has previously noted: "While the scope of a rebuttal is limited to the same subject matter encompassed in the opposing party's expert reports, district courts have been reluctant to narrowly construe the phrase 'same subject matter' beyond its plain language." *Roberts v. Los Alamos Nat'l Sec., LLC*, No. 11-CV-6206, 2016 WL 4442833, at *2 (W.D.N.Y. Aug. 19, 2016) (cleaned up). Astec concedes that the phrase "same subject matter" is not narrowly construed, but argues that the phrase has limits, citing *Rekor Systems, Inc. v. Loughlin*, No. 19-cv-7767, 2022 WL 2063857 (S.D.N.Y. June 8, 2022). According to Astec, the Hussain and Stein reports are not on the "same subject matter" because "the Stein Report is a medical diagnostic report which makes a brief response to Plaintiff's original life care plan—the Lajterman Report" while "[t]he Hussain Report is an entirely new life care plan." (Doc. 69 at 9.)

The *Rekor* court concluded that, "with limited possible exceptions," the report of the defendant's expert on franchising did not "repel, counteract, or disprove" any of the opinions in the report provided by plaintiff's expert on forensic accounting. *Rekor*, 2022 WL 2063857, at *7. The court agrees with Astec that a similar conclusion applies here. The majority of Dr. Hussain's life-care plan does not repel, counteract, or disprove Dr. Stein's diagnostic report. But there are exceptions: Dr. Hussain's inclusion of massage therapy implicitly contradicts Dr. Stein's opinion that it is not medically necessary, and Dr. Hussain's inclusion of costs for prosthetics and related supplies for Mr. Rebmann's lifetime implicitly challenges Dr. Stein's remark about prosthetic abandonment. This factor is therefore mixed.

40

### b.    Importance of Dr. Hussain's Testimony

Plaintiff asserts that Dr. Hussain's report and opinions "are important to counter the opinions of Dr. Stein so that plaintiff can offer his own objective testimony regarding Dr. Stein's medical opinions and life care planning needs of the plaintiff, and so the jury can weigh the importance of the testimony of both Dr. Stein and Dr. Hussain." (Doc. 68-4 at 8.) Astec maintains that Dr. Hussain's life-care report is of "questionable" importance, particularly because Plaintiff already has Ms. Lajterman's life-care report. (Doc. 69 at 10.) Both parties are correct in part. In general, a second life-care plan is not particularly important to Plaintiff's case. But medical opinions on the necessity or utility of the highest dollar-value treatments are very important to Plaintiff's damages case. This factor is also mixed.

### c.    Prejudice to Astec

Plaintiff argues that Dr. Hussain's report does not prejudice Astec, particularly because Astec had "an opportunity to rebut his report in writing and did so." (Doc. 68-4 at 9.) Plaintiff further asserts that there is no trial date in his case, and that Dr. Hussain's report is on a topic known to Astec and does not involve a new theory of liability. (Id.) Astec maintains that allowing both Dr. Hussain and Ms. Lajterman's reports would result in significant prejudice for three reasons: (1) "it could potentially permit a finder of fact to afford the Hussain Report and Lajterman Report greater weight since there would be two life care plans"; (2) "it will require Astec to incur additional expense to prepare for and conduct depositions of the two different life care plan experts"; and (3) failure to preclude Dr. Hussain's report would require a further amendment to the Expert Discovery Order in this case. (Doc. 69 at 10–11.)

The court is not persuaded that any of the items that Astec lists weigh significantly in favor of striking Dr. Hussain's report. Instructions to the jury can mitigate concerns about giving

more weight based on the quantity of evidence. The discovery order can be amended without prejudicing either side. Preparing to oppose a second life-care expert will require some additional expense, but it is not excessive in proportion to all the other expenses in this litigation.

### d.      Possibility of Continuance

Finally, Plaintiff asserts that a continuance is possible because "there is time afforded by the current case management order to complete expert discovery and depositions; and there is no trial date." (Doc. 68-4 at 9.) Quoting *Lidle v. Cirrus Design Corp.*, No. 08 Civ. 1253, 2009 WL 4907201, at *7 (S.D.N.Y. Dec. 18, 2009), Astec replies that a continuance would be inappropriate because "it would serve no purpose except to encourage the parties to ignore the scheduling order."

In December 2024, when Plaintiff filed his opposition to Astec's motion to strike Dr. Hussain's report, the court had ordered expert depositions completed by March 15, 2025. (Doc. 65.) Now, in mid-2026, all of the deadlines in that prior order have passed. However, it remains true that there is no trial date set in this case. And, unlike in *Lidle*, a continuance in this case would serve the purpose of completing the expert testimony in the areas of disagreement as between Dr. Stein and Dr. Hussain.[12]

For the reasons discussed above, the court declines to strike Dr. Hussain's report. The court instead elects to grant Astec an opportunity to serve a surrebuttal report. *See Miami Prods. & Chem. Co. v. Olin Corp.*, No. 19-CV-00385, 2022 WL 17746999, at *1 (W.D.N.Y. Dec. 6, 2022) ("[C]ourts routinely resolve disputes concerning improperly served expert reports by

---

[12] The court previously granted multiple prior extensions in this case, and in orders granting extensions in October and December 2023, the court cautioned that "NO FURTHER EXTENSIONS OF TIME SHALL BE GRANTED ABSENT DEMONSTRATION OF EXTRAORDINARY CIRCUMSTANCES." (Docs. 48, 57.) The court concludes that resolving this dispute and moving this case forward meets that standard.

affording the aggrieved party the opportunity to serve surrebuttal reports." (alteration in original; quoting *In re Specialist & Other Vessel Owner Limitation Actions*, No. 16 CIV. 5010, 2020 WL 8665287, at *2 (S.D.N.Y. June 30, 2020))).

### D.    Dennis Brickman, P.E. (Docs. 81, 85)

Turning from the plaintiff's experts to an expert on the defense side, the court considers Plaintiff's motion to exclude or limit Mr. Brickman's March 2025 report (Doc. 85), and Astec's motion to compel payment of fees for Mr. Brickman's February 2025 deposition (Doc. 81). Mr. Brickman provided an investigative report dated October 10, 2024. (Doc. 70-24.) He produced a supplemental report dated January 7, 2025. (Doc. 70-25.) After that January 7 report, Plaintiff's expert Dr. Goldhaber gave his deposition on January 30, 2025 (Doc. 70-18), and Plaintiff's expert Mr. Berry gave his deposition on January 31, 2025 (Doc. 70-17).

Mr. Brickman gave his own deposition on February 28, 2025. (Doc. 70-23.) He then produced a further "supplemental" report dated March 5, 2025. (Doc. 71-1.) The March 2025 report states that it "addresses the opinions of Gerald Goldhaber and Thomas Berry contained in their respective depositions not available to me at the time of my initial [October 2024] and supplemental [January 2025] reports." (*Id.* at 5.)

#### 1.    Motion to Exclude or Limit (Doc. 85)

Plaintiff seeks preclusion of Mr. Brickman's March 2025 report, arguing that it is untimely insofar as it contains new information and references; untimely under Fed. R. Civ. P. 26(a)(2)(D)(ii) insofar as it is intended to contradict or rebut Mr. Berry's opinion; and untimely under Fed. R. Civ. P. 26(e)(2) insofar as it is a "supplementation." (Doc. 85-13 at 19, 21.) Plaintiff further asserts that considering the report would prejudice him, particularly because, he asserts, Mr. Brickman "engaged in evasive responses." (*Id.* at 22.) Astec maintains that Mr.

43

Brickman's report is a timely supplemental disclosure under Rule 26(e)(1), and that Plaintiff was not prejudiced by any perceived "evasiveness." (Doc. 96 at 6.)

The first issues are whether Mr. Brickman's March 2025 report is a timely and proper supplementation. As to timeliness, Rule 26(e)(2) describes the duty to supplement expert disclosures as extending "both to information included in the report and to information given during the expert's deposition." The rule further provides: "Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due." Fed. R. Civ. P. 26(e)(2). Regarding pretrial disclosures, Rule 26(a)(3)(B) states: "Unless the court orders otherwise, these disclosures must be made at least 30 days before trial." Here, Plaintiff has identified no court order altering the deadline, and because no trial date has been set, Rule 26(a)(3)(B)'s 30-day deadline has not yet expired. The court therefore rejects Plaintiff's assertion that Mr. Brickman's March 2025 report is *untimely* supplementation. The more significant dispute is whether it is proper "supplementation" at all.

Plaintiff argues that Mr. Brickman's March 2025 report is not supplementation, asserting that Mr. Brickman "undertook new work and testing based on information and materials that were equally available to him at the time of his first report." (Doc. 85-13 at 21.) Astec disagrees, arguing that Mr. Brickman's March 2025 report provides "previously unavailable evidentiary details clarifying Brickman's original opinion that Plaintiffs' products liability expert Thomas Berry's . . . proposed alternative design for the interlocks and mesh guards are not feasible." (Doc. 96 at 7.)

The court has reviewed Mr. Berry's opinions in detail above. His initial and supplemental reports did not expressly identify the manufacturer or proposed dimensions of the mesh guard, or the manufacturer of the proposed interlock device. (*See* Docs. 70-21, 70-22.)

44

However, after Mr. Brickman produced his January 2025 report, he received Mr. Berry's expert file—produced at some point in connection with Mr. Berry's January 2025 deposition—which included some AGSCO grate product literature. (Doc. 70-23 at 95.) Mr. Brickman also reviewed Mr. Berry's January 31, 2025, deposition after producing his (Brickman's) report dated January 7, 2025. (Doc. 71-1 at 25.) Mr. Berry testified at that deposition that Micro Switch had sealed[13] interlock switches in 1984. (Doc. 70-17 at 40.)

The court agrees with Plaintiff that Mr. Brickman could have determined the manufacturer of the exemplar mesh guard before January 2025. The products pictured in Mr. Berry's August 2024 report appear together with a list of part numbers beginning with "M-ASG-SID" or "M-ASG-SIHD." (Doc. 70-21 at 12.) Based on that information, only minimal research would have been required to identify AGSCO as the manufacturer of those parts. Mr. Brickman could have offered his criticisms of the AGSCO product at the time of his October 2024 report.

As for the interlock switch, even if Mr. Brickman could not have identified Micro Switch as the manufacturer that Mr. Berry was contemplating, he had already researched examples of OSHA accident investigations associated with interlocked guards on industrial machinery. (Doc. 70-24 at 38–39.) For his March 2025 report, he researched additional OSHA accident investigations specifically involving Micro Switch interlock devices. (Doc. 71-1 at 7–9.) As Mr. Brickman concedes, the additional research only "reiterate[s]" his prior conclusion that an interlock would not have prevented Mr. Rebmann's injury. (*Id.* at 7.) This is not proper "supplementation." *See* 6 Moore's Federal Practice § 26.131[2] (3d ed.) ("[A] supplemental

---

[13] The proposed interlock switches for the baghouse would have to be sealed to prevent dust intrusion.

expert report that states additional opinions or seeks to strengthen or deepen opinions expressed in the original report is beyond the scope of proper supplementation . . . .").

Because Mr. Brickman's March 2025 report is not proper supplementation, the court turns next to consider the remedy. Plaintiff seeks "to exclude, or alternatively limit" Mr. Brickman's March 2025 report. (Doc. 85-13 at 4.) Astec maintains that the March 2025 should not be excluded. (Doc. 96.) Although the parties have not offered a complete analysis of the *Softel* factors for Mr. Brickman's March 2025 report, the court applies those factors here.

For the reasons above, the court rejects Astec's explanations for providing the "supplemental" report. In the court's view, Mr. Brickman's March 2025 opinions regarding the AGSCO mesh guard are of limited importance because Mr. Berry cited that manufacturer's product only as an example. The AGSCO product's one-inch openings might allow a finger to pass through, but a different screen with openings smaller than one inch could be specified. Moreover, even a screen with one-inch openings would have been safer than no screen at all.

At the same time, Mr. Brickman's March 2025 opinions about reduced visibility from the proposed interlocked mesh guard (Doc. 71-1 at 18–19) are more detailed than his opinion on that topic in his October 2024 report (Doc. 70-24 at 40). Plaintiff asserts that failure to exclude Mr. Brickman's March 2025 report or related testimony would result in "extreme" prejudice. (Doc. 85-13 at 22.)[14] The court concludes that any such prejudice can be mitigated by granting

---

[14] As to Mr. Brickman's February 2025 deposition testimony, Plaintiff asserts that Mr. Brickman engaged in "evasive responses" and in "lengthy monologues when questions were not even pending. (Doc. 85-13 at 22.) Astec maintains that seeking court intervention—not wholesale exclusion—would be the proper remedy for any evasiveness at deposition. (Doc. 96 at 10–11.) By its terms, Plaintiff's motion seeks preclusion of Mr. Brickman's March 2025 report, not his February 2025 deposition. (Doc. 85-13 at 19.) Evasiveness in any trial testimony that Mr. Brickman might offer can be addressed through objections or as part of the jury's credibility determination.

46

Plaintiff the opportunity for a surrebuttal. *See Miami Prods.*, 2022 WL 17746999, at *1.  A continuance for that purpose will complete the expert testimony and move this case toward conclusion.  Given Astec's opportunity to produce a surrebuttal to Dr. Hussain, granting a similar opportunity for plaintiff as to Mr. Brickman appears to be both balanced and limited.

### 2.   Motion to Compel Payment of Deposition Fees (Doc. 81)

In a letter motion dated June 3, 2025, Astec seeks an order compelling Plaintiff to pay $875, representing a purported "outstanding" balance due after accounting for a 1.5-hour reduction in the deposition time for Astec's human-factors expert, Manuel Meza-Arroyo, Ph.D., and a 3.5-hour increase in Mr. Brickman's deposition time.  (Doc. 81.)  Mr. Brickman and Dr. Meza-Arroyo both work for Engineering Systems Inc. ("ESI").  Plaintiff has not filed an opposition to the motion, but Plaintiff's position is reflected in an email dated May 15, 2025: "There is no outstanding invoice to ESI.  We already paid them $5,600.00.  If anything they should credit us back 100% of the time we paid for Brickman's testimony since he was evasive." (Doc. 81-8 at 2.)

"A party's counsel may be compelled to pay the costs incurred when a party deposes an opponent's expert witness because there is at least a joint and several liability for the payment of fees under Rule 26(b)(4)(E) . . . ."  6 Moore's Federal Practice § 26.80[3][c] (3d ed.).  Here, the evidence confirms Plaintiff's assertion that Plaintiff paid $5,600.  (Doc. 81-7 at 2.)  But the evidence also indicates that there is still $875 due to ESI because the $5,600 was based on an anticipated seven-hour deposition for Dr. Meza-Arroyo at $385 per hour and a seven-hour deposition for Mr. Brickman at $415 per hour.  (Docs. 81-5, 81-6, 81-7.)  ESI issued a revised invoice after those two depositions were complete, reflecting 5.5 hours of deposition time for Dr.

47

Meza-Arroyo and 10.5 hours of deposition time for Mr. Brickman. (Doc. 81-7.) The court concludes that Astec's motion on this issue should be granted.

## II.    Astec's Motion for Summary Judgment Against Plaintiff (Doc. 70)

Astec's motion seeks summary judgment as to all claims: design defect, negligence, manufacturing defect, and failure to warn. (Doc. 70-1 at 2–3.) Plaintiff does not oppose dismissal of the manufacturing-defect claim, but otherwise opposes the motion. (Doc. 84-18.) Astec has filed a reply. (Doc. 95.) The court reviews Astec's motion as to each of the remaining claims. The parties agree that New York law applies to each of the claims.

### A.    Design Defect

There is no dispute as to the applicable New York law for design-defect claims. For either negligence or strict products liability claims based on a defective-design theory, the plaintiff must prove that: (1) "the product, as designed, was not reasonably safe because there was a substantial likelihood of harm"; (2) "it was feasible to design the product in a safer manner"; and (3) "the defective design was a substantial factor in causing plaintiff's injury." *Amica Mut. Ins. Co. v. WHAC LLC*, 447 F. Supp. 3d 6, 9 (W.D.N.Y. 2020) (quoting *Voss v. Black & Decker Mfg. Co.*, 59 N.Y. 2d 102, 107, 463 N.Y.S.2d 398, 450 N.E.2d 204 (1983)). "Defendants may rebut this evidence by showing that the product is safe—that is, that its utility outweighs its risks, and that the product's design reduces the risks to the greatest extent possible to retain its inherent usefulness." *Id.*

Under New York's "risk-utility" approach, courts consider the following non-exclusive factors:

> (1) the utility of the product to the public as a whole and to the individual user;
> (2) the nature of the product—that is, the likelihood that it will cause injury; (3) the
> availability of a safer design; (4) the potential for designing and manufacturing the
> product so that it is safer but remains functional and reasonably priced; (5) the

48

ability of the plaintiff to have avoided injury by careful use of the product; (6) the degree of awareness of the potential danger of the product which reasonably can be attributed to the plaintiff; and (7) the manufacturer's ability to spread any cost related to improving the safety of the design.

*Acquisto v. Manitowoc Co.*, 273 F. Supp. 3d 343, 347–48 (W.D.N.Y. 2017) (quoting *Voss.*, 59 N.Y.2d at 109). "Whether a product is defectively designed such that its utility outweighs its dangers is typically a question of fact for the jury." *Amica*, 447 F. Supp. 3d at 9. "New York courts uniformly rule that competent, non-conclusory expert testimony is needed in cases involving more complex design issues." *Nemes v. Dick's Sporting Goods, Inc.*, 521 F. Supp. 3d 328, 337–38 (S.D.N.Y. 2021) (quoting *Guarascio v. Drake Assocs. Inc.*, 582 F. Supp. 2d 459, 463 (S.D.N.Y. 2008)).

The first of Astec's two arguments for summary judgment on the design-defect claim is Astec's contention that the opinions of Plaintiff's expert, Mr. Berry, must be excluded. (Doc. 70-1 at 11.) The court rejects that argument because, for the reasons above, the court is not excluding Mr. Berry's opinions. The court therefore considers Astec's argument that, even if Mr. Berry's opinions are not excluded, Astec is still entitled to summary judgment. The court considers the six aspects of this argument in turn.

### 1.    "Substantial Modification" After Manufacture

Plaintiff does not dispute that, after the baghouse was manufactured and delivered to Gernatt in 1984: (1) the crossover screw was replaced with a screw with flighting that varied from the as-built drawings, and (2) "the original stub shaft bolt had been replaced by a bolt that rubbed on the cross screw, thereby damaging it." (Doc. 84-18 at 15.) Astec asserts that these changes constitute "substantial alterations or modifications" from the baghouse's original condition, thereby precluding liability. (Doc. 70-1 at 12.) Plaintiff disagrees, arguing that the "substantial modification" defense is available "only where the post-sale modification destroyed

49

or bypassed a 'safety feature.'" (Doc. 84-18 at 15.) Astec maintains that the substantial-modification doctrine is not limited to modifications that defeat safety features. (Doc. 95 at 5.)

Analysis of this dispute begins with *Robinson v. Reed-Prentice Division of Package Machinery Co.*, 49 N.Y.2d 471, 403 N.E.2d 440, 426 N.Y.S.2d 717 (1980). The plaintiff in that case was injured while operating a plastic molding machine, the safety gate for which had been modified by the plaintiff's employer by cutting a hole in the Plexiglas. The Court of Appeals in that case stated its holding as follows:

> [A] manufacturer of a product may not be cast in damages, either on a strict products liability or negligence cause of action, where, after the product leaves the possession and control of the manufacturer, there is a subsequent modification which substantially alters the product and is the proximate cause of plaintiff's injuries.

*Id.* at 475. Because the modification in *Robinson* was to a safety device, the holding clearly covers modifications to safety devices. *See Liriano v. Hobart Corp.*, 132 F.3d 124, 128 (2d Cir. 1998) ("*Robinson* squarely holds that a manufacturer may not be liable—in strict products liability or negligence—on a *design defect* claim for injuries caused in part by alteration or modification of a safety device . . . ."). Does the rule cover modifications to other components that are not safety devices?

The Second Circuit in *Jiminez v. Dreis & Krump Manufacturing Co.* stated that "the rule in *Robinson* need not be limited to an alteration to a safety device." 736 F.2d 51, 55 (2d Cir. 1984). But the *Jiminez* court went on to hold that the "substantial alteration" doctrine did not entitle the defendant to summary judgment because there was a dispute of fact whether the modification in that case—replacing the mechanical foot pedal with an electric pneumatic activating device—proximately caused the injury. *Id.* The court concludes that a similar result obtains in Mr. Rebmann's case.

50

Astec asserts that Mr. Rebmann would not have needed to perform the inspection in this case if the crossover screw had not been modified because the bolt and shaft would not have come in contact and the worn spot that Mr. Rebmann observed in the days before March 19, 2020, would not have occurred. (Doc. 70-1 at 13.) Plaintiff appears to concede that the modification or use of the wrong bolt was a "[b]ut for" cause of his injury. (Doc. 84-18 at 15.) But he asserts that another cause was Astec's alleged failure to "incorporate adequate safety features that would have prevented plaintiff's hand from contacting the rotating screw." (*Id.*) With this dispute on causation, the court concludes that, like the defendant in *Jiminez*, Astec is not entitled to summary judgment on its "substantial alteration" defense. This conclusion makes it unnecessary to decide whether the rule in *Robinson* is limited to alterations of safety devices.

### 2.    Use in the "Intended or Reasonably Foreseeable Manner"

Astec next seeks summary judgment on the theory that "[t]he Baghouse was never intended to be operated with the access door off" and that "Plaintiff's operation with the access door open and without following lockout/tagout ('LOTO') procedures was an unintended and unforeseeable use." (Doc. 70-1 at 14.) Astec relies upon *Hockler v. William Powell Co.*, 129 A.D.3d 463, 465, 11 N.Y.S. 45 (1st Dep't 2015), for the proposition that a design-defect claim should be dismissed where a plaintiff did not use the product "in a reasonably foreseeable manner" and his action "was not an intended use of the product."

Plaintiff asserts that "[t]o the extent *Hockler* can be so construed, it misstates the applicable law." (Doc. 84-18 at 16.) According to Plaintiff, the applicable law is that:

> a manufacturer is obligated to exercise that degree of care in his plan or design so as to avoid any unreasonable risk of harm to anyone who is likely to be exposed to the danger when the product is used in the manner for which the product was intended . . . *as well as an unintended yet reasonably foreseeable use.*

51

*Micallef v. Miehle Co.*, 39 N.Y.2d 376, 385–86, 348 N.E.2d 571, 384 N.Y.S.2d 115 (1976) (emphasis added). And Plaintiff asserts that the record "would support a finding that it was reasonably foreseeable [that] a person would at times have to view the baghouse screws' operation through the open access door while the screws were rotating." (Doc. 84-18 at 17.) Astec maintains that "*Hockler* did not ignore foreseeable misuses; it held that the product was not used 'in a reasonably foreseeable manner.'" (Doc. 95 at 8 n.3.)

It therefore appears that there is no dispute that a design-defect claim should be dismissed if the product's use (for an intended purpose or otherwise) was not reasonably foreseeable. The court need not decide here whether Mr. Rebmann's conduct on the morning of March 19, 2020, was a "use" or "misuse" of the baghouse. Instead, the dispute is whether his conduct was reasonably foreseeable. That question is usually one for the factfinder. *See Porrazzo v. Bumble Bee Foods, LLC*, 822 F. Supp. 2d 406, 418 (S.D.N.Y. 2011) ("Whether a particular way of misusing a product is reasonably foreseeable . . . [is] ordinarily [a] question[] for the jury." (quoting *Johnson v. Johnson Chem. Co.*, 183 A.D.2d 64, 588 N.Y.S.2d 607, 610 (2d Dep't 1992))). This case is no exception.

Plaintiff also argues that it was reasonably foreseeable that a person might "view the baghouse screws' operation through the open access door while the screws were rotating." (Doc. 84-18 at 17.) He asserts that Astec's expert, Mr. Brickman, "implicitly recognized that it could at times be necessary for a worker to observe the screws while in motion, positing that in doing so the worker should use a cellphone or mirror attached to a stick in order to maintain a safe distance from the screw." (*Id.* at 18.) Astec correctly points out that Mr. Brickman's report states that "[e]*ven if* Anthony Rebmann was required to inspect the subject baghouse cross screw, he did not need to place his hands in the danger zone" because he "could have used a

52

number of tools/procedures to have avoided his incident." (Doc. 70-24 at 24–25 (emphasis added).) The court agrees that Mr. Brickman was not necessarily opining that visual inspections with the door open might be foreseeable.

However, Plaintiff also cites testimony from Mr. Enser that "there have been times" when he had the inspection door open and also "had to have that screw rotating to check and make sure everything was okay." (Doc. 70-14 at 82.) One such time was the date in March 2020 when Mr. Rebmann replaced the bearings. (*Id.*) Robert Rebmann similarly testified that he previously had the access door open while the baghouse was operating. (Doc. 84-10 at 79.) Astec contends that "the fact that other employees may have misused the Baghouse does not make that misuse reasonably foreseeable to Astec in 1984." (Doc. 95 at 8.) The court concludes that other such instances do not necessarily prove foreseeability, but that the factfinder should consider and decide that question.

### 3.    Substantial Likelihood of Harm

As noted above, one of the essential elements for a defective-design theory is that there was a substantial likelihood of harm. In Point I(B)(3) of its memorandum, Astec contends that Plaintiff cannot show that the baghouse created a substantial likelihood of harm because there have been no reports of other substantial injuries involving the baghouse since it was put into service in 1984. (Doc. 70-1 at 18.) Plaintiff's opposition does not directly address or analyze Point I(B)(3). Astec suggests that Plaintiff's failure to address Point I(B)(3) constitutes a concession. (Doc. 95 at 8.) The court is not persuaded that Plaintiff has conceded this issue. The opposition memorandum does not expressly analyze Point I(B)(3), but it does include an assertion that a jury could reasonably find that the baghouse presented an unreasonable risk of harm. (Doc. 84-18 at 26.)

53

Evidence of prior harm would certainly be relevant and would tend to support a finding of a substantial likelihood of harm. *Cf. Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 80 (2d Cir. 1997) (Calabresi, J.) (in negligence action for injuries sustained at airline's baggage carousel, existence of prior accidents was "relevant"). But such evidence was not necessary to prove negligence in *Stagl. Id.* Nor has Astec cited any authority for the proposition that it might be necessary to Mr. Rebmann's case. Astec is not entitled to summary judgment on this point.

**4. State of the Art and Industry Standards at Time of Manufacture**

Citing *Wesp v. Carl Zeiss, Inc.*, 11 A.D.3d 965, 967, 783 N.Y.S.2d 439 (4th Dep't 2004), Astec argues that it has satisfied its "initial burden" on summary judgment with evidence that the baghouse was "state of the art at the time of [its] design and manufacture, and complied with all applicable industry standards." Plaintiff maintains that the baghouse was not "state of the art" and did not comply with ANSI B20.1-1984 or ISO 1819-1977. (Doc. 84-18 at 21.) And Plaintiff contends that "[i]n any event, even assuming the baghouse complied with industry standards when made, it would not establish that it was not defectively designed." (*Id.* at 23.)

*Wesp* is distinguishable. The court in that case discussed the requirements of the defendant's "initial burden," and went on to hold that the plaintiffs "failed to meet their burden in opposition by establishing that the product 'was not reasonably safe and that it was feasible to design the product in a safer manner.'" *Wesp*, 11 A.D.3d at 967 (quoting *Banks v. Makita, U.S.A.*, 226 A.D.2d 659, 661, 641 N.Y.S.2d 875 (2d Dep't 1996)). In contrast, for the reasons discussed in this decision, Plaintiff has produced sufficient evidence that the baghouse was not reasonably safe and that it was feasible to design it in a safer manner.

The court also agrees with Plaintiff that "compliance with customary or industry practices is not dispositive of due care." *Miner v. Long Island Lighting Co.*, 40 N.Y.2d 372, 381,

54

353 N.E.2d 805, 386 N.Y.S.2d 842 (1976); *see also, e.g., Miller v. Sportsman's Guide, LLC,* No. 20-CV-00271, 2024 WL 1683842, at *14 (W.D.N.Y. Mar. 28, 2024) ("[A] manufacturer's adherence to industry standards does not establish that it exercised due care and produced a product which was reasonably safe." (citing *Miner*, 40 N.Y.2d at 381)).  Astec offers no response to these points, and the court concludes that Astec is not entitled to summary judgment on this argument.

### 5.    Alternative Designs

Next, Astec contends that Plaintiff "has not and cannot show that feasible alternative designs would have prevented the accident." (Doc. 70-1 at 19.)  This argument essentially incorporates Astec's arguments in its motion to strike or exclude Mr. Berry's opinions. (*See id.* at 20.)  The court is denying that motion for the reasons discussed in detail above. *See supra.* Astec is not entitled to summary judgment on this point.

### 6.    Causation—"Substantial Factor"

As described above, the final essential element of a design-defect claim is that the defective design was a "substantial factor" in causing plaintiff's injury.  Astec argues that Plaintiff cannot prove this element because: (a) "Plaintiff's negligence proximately caused Plaintiff's accident"; and (b) "Gernatt's failure to supervise, oversee and enforce basic safety protocols also proximately caused Plaintiff's accident." (Doc. 70-1 at 23–25.)  Plaintiff maintains that his conduct "at most constitutes comparative negligence, not the sole proximate cause of his injuries." (Doc. 84-18 at 20–21.)  Although Plaintiff does not directly discuss Astec's argument about Gernatt's own potential liability, the court infers that Plaintiff's position on that point is similar; that any negligence by Gernatt was not the sole proximate cause.

55

As this court has observed, "[c]omparative negligence is nearly always a question for the jury." *Crout v. Haverfield Int'l, Inc.*, 269 F. Supp. 3d 90, 105 (W.D.N.Y. 2017). In this case, the court cannot conclude as a matter of law that any negligence on Mr. Rebmann's part was the "sole" proximate cause of his injury. The court's conclusion is the same as to any negligence on Gernatt's part.

## B.    Negligence

The complaint asserts a negligence claim against Astec in addition to the design-defect claim. Astec seeks summary judgment on the negligence claim for the same reasons that it seeks summary judgment on the design-defect claim. (Doc. 70-1 at 26.) For the reasons above, the court concludes that Astec is not entitled to summary judgment on the design-defect claim. Astec's argument for summary judgment on the negligence claim therefore also fails.

## C.    Failure to Warn

Finally, Astec argues that it is entitled to summary judgment on any failure-to-warn claim because: (A) the dangers of placing a hand near the rotating screw were "open and obvious"; (B) warnings would have made no difference because Mr. Rebmann already knew of the danger; and (C) any additional warning would not have changed Mr. Rebmann's behavior. (Doc. 70-1 at 27–32.) The court's analysis of Astec's motion to strike Dr. Goldhaber's opinions explains why Astec is not entitled to summary judgment on the latter two points. *See supra* (the inquiry is not whether warning signage would have made the user aware of a danger of which they were previously unaware).

As to the first point, Plaintiff agrees that in some cases, courts can decide whether a risk was "open and obvious" as a matter of law and award judgment to the defendant on a failure-to-warn claim. (Doc. 84-18 at 29.) But Plaintiff asserts that this is not such a case. Astec

disagrees, arguing that the danger could or should have been recognized "as a matter of common sense." (Doc. 95 at 13.)

"The question of whether a condition is open and obvious 'is generally a jury question, and a court should only determine that a risk was open and obvious as a matter of law when the facts compel such a conclusion.'" *White v. CSX Transp., Inc.*, No. 19-CV-500, 2023 WL 7166523, at *5 (W.D.N.Y. Oct. 31, 2023) (quoting *Borley v. United States*, 22 F.4th 75, 81 (2d Cir. 2021). This is not one of the exceptional cases where the facts compel a conclusion that the risk was "open and obvious." A jury should make that determination, considering all of the facts and circumstances, including Mr. Rebmann's testimony that his hand inadvertently contacted the inspection door ledge while he was crouching down and trying to steady himself.

## III.    Astec's Motion for Partial Summary Judgment Against Gernatt (Doc. 73)

Astec's third-party complaint against Gernatt consists of two counts: (1) contribution, and (2) negligent training and supervision. (Doc. 27.) Astec has moved for partial summary judgment on both counts, asserting that "if Astec is found liable to Plaintiff, then it is entitled to contribution from Gernatt on Astec's contribution claim with a liability apportionment and amount to be determined at trial." (Doc. 73-1 at 7.) Gernatt maintains that Astec's motion should be denied in its entirety. (Doc. 90 at 3.)

Astec is in the role of a plaintiff for the claims against Gernatt. And "it is unusual for a plaintiff to move for summary judgment." *Montesano v. Westgate Nursing Home, Inc.*, 956 F. Supp. 2d 417, 421 (W.D.N.Y. 2013). Still, "where the undisputed facts warrant it, summary judgment can certainly be entered in a plaintiff's favor." *Id.*

57

## A.    Contribution

As an opening point, Astec recognizes the general bar on contribution or indemnity claims against an employer under N.Y. Workers' Comp. Law § 11: "An employer shall not be liable for contribution or indemnity to any third person based upon liability for injuries sustained by an employee acting within the scope of his or her employment for such employer . . . ." But Astec relies on the exception under which an employer can be liable to a third person if "such third person proves through competent medical evidence that such employee has sustained a 'grave injury' which shall mean only one or more of the following: . . . loss of multiple fingers . . . ." N.Y. Workers' Comp. Law § 11. Gernatt does not oppose Astec's position on this point. Section 11 is therefore not an impediment to Astec's claims against Gernatt.

On the merits of the contribution claim, there appears to be no dispute that New York's contribution statute applies. The statute provides, in pertinent part: "[T]wo or more persons who are subject to liability for damages for the same personal injury . . . may claim contribution among them whether or not an action has been brought or a judgment has been rendered against the person from whom contribution is sought." N.Y. C.P.L.R. § 1401. Importantly, "the existence of some form of tort liability is a prerequisite to application of the [contribution] statute." *Rochester Gas & Elec. v. GPU, Inc.*, No. 00-CV-6369, 2006 WL 8446245, at *2 (W.D.N.Y. Sept. 25, 2006) (alteration in original) (quoting *Bd. of Educ. v. Sargent, Webster, Crenshaw & Folley*, 71 N.Y.2d 21, 28 (1987)). Asetc's only substantive tort claim against Gernatt is the negligent-training-and-supervision claim in the second count of the third-party complaint. Astec argues that it is entitled to summary judgment on that claim. Gernatt disagrees. The court considers that issue next.

58

**B.    Negligent Training and Supervision**

Astec seeks summary judgment on its claim that Gernatt failed to adequately train and supervise Mr. Rebmann, arguing that: (A) Gernatt had a duty to train him to LOTO the baghouse and to supervise him; (B) Gernatt breached those duties; and (C) the alleged breach proximately caused Mr. Rebmann's injuries. (Doc. 73-1 at 2–3.) Gernatt opposes Astec's motion, arguing that "Astec has not demonstrated that Gernatt was negligent as a matter of law" and that "Astec cannot establish that any purported negligence by Gernatt was a proximate cause of Plaintiff Anthony Rebmann's injuries." (Doc. 90 at 3.) Gernatt asserts that it maintained "comprehensive" LOTO procedures, trained Mr. Rebmann thoroughly, and implemented safeguards, but that Mr. Rebmann "knowingly disregarded these procedures." (Doc. 90 at 3.) In reply, Astec concedes that Mr. Rebmann's acts and omissions are a proximate cause of the incident, but that "so too are the failures of Gernatt to adequately train, supervise, and oversee Plaintiff." (Doc. 92 at 5.)

There is no dispute as to the applicable substantive New York law. Like any negligence claim, a claim for negligent training and supervision includes the following essential elements: "[1] a duty on the part of the defendant; [2] a breach of that duty by conduct involving an unreasonable risk of harm; [3] damages suffered by the plaintiff, and [4] causation, both in fact and proximate, between the breach and the plaintiff's harm." *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 117 (2d Cir. 2013) (alterations in original) (quoting *McCarthy v. Olin Corp.*, 119 F.3d 148, 161 (2d Cir. 1997) (Calabresi, J., dissenting)); *see also D.J. ex rel. Comfort v. Corning-Painted Post Area Sch. Dist.*, 722 F. Supp. 3d 148, 166 (W.D.N.Y. 2024) (listing "the usual elements of negligence").

59

### 1.    Duty

On the element of duty, Astec contends that Gernatt had duties to train Mr. Rebmann to safely operate the baghouse (including use of LOTO procedures) and to supervise him while working on hazardous machines. (Doc. 73-1 at 10.) Although Gernatt observes that OSHA regulations do not impose a statutory duty of care in civil negligence cases (Doc. 90 at 8), Gernatt does not dispute that it had duties "to train and supervise Plaintiff." (*Id.* at 5.) Instead, Gernatt contends that "[t]here is overwhelming evidence that Gernatt satisfied its duty." (*Id.*) The court considers that argument next in the context of the "breach" element.

### 2.    Breach

Astec argues that Gernatt breached its duties in several ways; the court considers each in turn. Astec concedes that Gernatt has a LOTO program in place but argues that Gernatt failed to ensure that Anthony Rebmann and his supervisor, Robert Rebmann, both understood the LOTO policy. (Doc. 73-1 at 14.) Astec cites various evidence in support, including:

- Mr. Rebmann did not recall seeing and was not familiar with the contents of Gernatt's "Energy Control (Lockout/Tagout) Program" document dated January 31, 2017. (Doc. 70-12 at 95–96 (Mr. Rebmann's testimony); Doc. 72-15 (Gernatt "Energy Control (Lockout/Tagout) Program" document).)

- Mr. Rebmann remembered attending trainings after Gernatt hired him, including an eight-hour Mine Safety and Health Administration (MSHA) safety course, "annual refresher" trainings that included LOTO instruction, a 10-hour OSHA course that included a LOTO module. (Doc. 70-12 at 37, 83–89.) But at his deposition he could not recall much of what he learned at those trainings. (*See* Doc. 70-12 at 78, 82–89.)

60

- Mr. Rebmann was not familiar with the OSHA regulation at 29 C.F.R. § 1910.147, and did not recall any training on the procedures in that regulation. (Doc. 70-12 at 80, 94.)

- Mr. Rebmann did not recall receiving any "manuals to determine specific hazards related to equipment" at the plant. (Doc. 70-12 at 96.)

- Mr. Rebmann's testimony that "sometimes production trumps safety at Gernatt." (Doc. 70-12 at 103.)

From this evidence, Astec concludes that "[w]hatever trainings that Gernatt did provide were perfunctory and ineffectual." (Doc. 73-1 at 15.) For its part, Gernatt insists that it had "an extensive, documented safety and LOTO program." (Doc. 90 at 5.)

On this issue, the court concludes that Astec has not met its burden to show an absence of a genuine dispute of material facts. Mr. Rebmann's testimony that Gernatt sometimes put production ahead of safety might be relevant, but it does not prove a breach of the duty to train. The undisputed evidence is that Gernatt did have a written LOTO procedure and also provided safety trainings, which Mr. Rebmann attended. Mr. Rebmann's failure to recall the materials or the content of the trainings might be some evidence that the trainings were inadequate, but it might also merely be a result of a faded memory between the 2024 deposition and the trainings many years earlier.

The essence of Astec's position appears to be that Gernatt failed to "test or otherwise ensure" that Mr. Rebmann was sufficiently knowledgeable about and compliant with safety and LOTO policies. (Doc. 73-1 at 16.) In support, Astec relies upon *Hicks v. Berkshire Farm Center & Services for Youth*, 123 A.D.3d 1319, 999 N.Y.S.2d 879 (3d Dep't 2014). The plaintiff in that case brought a negligence action against the employer of a counselor who entered her room at

defendant's facility and had sexual intercourse with her. The trial court denied the defendant's motion for summary judgment on the negligent training and supervision claims. The Appellate Division affirmed, noting evidence that the employer "did not test or otherwise ensure that its staff members were knowledgeable and complaint with its written policies and instructional materials." *Hicks*, 123 A.D.3d at 1321. However, Astec cannot prevail on this basis, because—even assuming that Gernatt failed to verify Mr. Rebmann's knowledge and compliance—the *Hicks* court did not hold that the employer's failure to "test or otherwise ensure" knowledge and compliance entitled the plaintiff to summary judgment. To the contrary, the appellate court did not disturb the trial court's denial of the plaintiff's cross-motion. *Id.* at 1320.

Astec also contends that Gernatt failed to adequately supervise Mr. Rebmann based on Astec's view that the evidence shows that: (1) Anthony Rebmann's supervisor, Robert Rebmann, did not himself understand Gernatt's LOTO procedures and therefore could not have adequately supervised Anthony Rebmann; (2) Gernatt failed to ensure that controls were implemented when the access door to the baghouse was open; (3) Gernatt violated 29 C.F.R. § 1910.147(c)(6)(i) by failing to have Mr. Rebmann participate in an annual inspection of machine-specific requirements in 2020; (4) Gernatt allowed Mr. Rebmann to work on the baghouse without anyone else around; (5) Gernatt failed to take corrective action after Mr. Rebmann's involvement in three prior safety incidents. (Doc. 73-1 at 17–22.) The court reviews each of these points below and concludes that Astec has not shown that the evidence is undisputed or that the evidence mandates summary judgment in Astec's favor.

In his testimony, Robert Rebmann conceded that Gernatt's LOTO practice was not always consistent with safe practices or proper LOTO policy. (Doc. 71-5 at 71–73.) He also testified that he could not recall if Gernatt implemented "any type of controls . . . to reduce the

62

risk of injury if the access door had to be opened while the screw was being operated." (*Id.* at 80.) The court concludes that this is relevant evidence of Robert Rebmann's own shortcomings as Anthony Rebmann's supervisor, but it does not conclusively establish that Robert Rebmann or Gernatt are liable for negligent supervision. Astec cites no authority suggesting otherwise.

Regarding implementation of "controls" when the access door was open, Robert Rebmann's failure to recall is not the only relevant evidence. Mr. Enser testified that he implemented "controls" at the times that the door was off and the screw was energized. (Doc. 70-14 at 82.) He would have an operator in the control house with a radio or cell phone, and would have another person watching the screw. (*Id.* at 126–27.)

As to 29 C.F.R. § 1910.147(c)(6)(i), Plaintiff does not dispute that this regulation requires that "[t]he employer shall conduct a periodic inspection of the energy control procedure at least annually to ensure that the procedure and the requirements of this standard are being followed" and that "each authorized" employee must participate in a review with the inspector for LOTO energy control. Nor does Mr. Rebmann dispute that he was an "authorized" employee as defined at 29 C.F.R. § 1910.147(b). And Mr. Dicembre, testified that in March 2020 Gernatt's authorized employees did not participate in the annual inspection of the machine-specific lockout procedures; he had no explanation for why they did not. (Doc. 70-15 at 274–75.)

Gernatt asserts that any failure to perform the inspection under 29 C.F.R. § 1910.147(c)(6)(i) was at most "an administrative issue" that "does not negate the existence and effectiveness of Gernatt's LOTO program." (Doc. 90 at 20.) The court agrees that evidence of violation of § 1910.147(c)(6)(i) is "merely some evidence of negligence but does not establish negligence as a matter of law." *McGowan v. United States*, 825 F.3d 118, 128 (2d Cir. 2016)

63

(per curiam) (quoting *Chen v. United States*, 854 F.2d 622, 627 (2d Cir. 1988)). This conclusion applies to the extent that Gernatt violated other provisions of § 1910.147.[15]

It is undisputed that Mr. Rebmann was the only worker in the vicinity of the baghouse at the time of his injury. Astec asserts that this was "not the proper procedure" and that Robert Rebmann and Gernatt were at fault for "knowingly allow[ing]" Mr. Rebmann to do the work alone. (Doc. 73-1 at 19.) Robert Rebmann did testify that he "allow[ed] him [Anthony Rebmann] to do the work without anyone in the control room" and that he (Robert Rebmann) believed that nobody needed to check to make sure the baghouse was LOTOed at the time because, apart from Anthony Rebmann, "no one was around." (Doc. 71-5 at 106.) Here, again, the court concludes that this is relevant evidence of Robert Rebmann's own shortcomings as Anthony Rebmann's supervisor, but it does not conclusively establish that Robert Rebmann or Gernatt are liable for negligent supervision. Astec cites no authority suggesting otherwise.

Finally, as noted above, Anthony Rebmann was involved in safety incidents before his injury on March 19, 2020. These included an injury to his left index finger, an injury in 2017 while using hydraulic shears, and an injury to his right eye while drilling a hole in a metal skimmer in 2019. (*Id.* at 28–29; Doc. 72-1.) Mr. Rebmann was also involved in the incident on March 9, 2020, where Mr. Enser observed him within two feet of the open access door with the screws energized. Astec contends that Gernatt "fail[ed] to take corrective action" in each of these instances, and thus "failed to exercise reasonable care for Plaintiff's safety." (Doc. 73-1 at 22.)

---

[15] Astec notes that the incident on March 19, 2020, resulted in an OSHA investigation, which Gernatt settled by paying a fine and agreeing that it violated 29 C.F.R. § 1910.147. (*See* Doc. 70-15 at 319–320.)

Gernatt appears to concede that Mr. Rebmann engaged in "repeated acts of unsafe conduct." (Doc. 90 at 15.) But Gernatt does not directly address Astec's contention that Gernatt failed to impose discipline or take corrective action in those instances. Still—like much of the other evidence that Astec cites—this evidence can *support* a theory that Gernatt failed to properly train or supervise Mr. Rebmann, but it does not establish that theory as a matter of law.

### 3.      Remaining Elements: Causation, Harm

Because the court has concluded that Astec cannot show an absence of a genuine issue of material fact as to the "breach" element, it is unnecessary to discuss the remaining elements here. Astec is not entitled to summary judgment against Gernatt as to liability.

## Conclusion

Astec's Motion to Strike the Expert Report of Nadeem Hussain (Doc. 66) is DENIED. The court anticipates entering a new case management order that will grant Astec an opportunity to serve a surrebuttal report. The court grants the parties 30 days to submit a new proposed case management order.

Astec's Motion for Summary Judgment Against Plaintiff (Doc. 70) is DENIED.

Astec's Motion for Partial Summary Judgment against Gernatt (Doc. 73) is GRANTED insofar as the court rules that N.Y. Workers' Comp. Law § 11 is not an impediment to Astec's contribution claim; the motion is otherwise DENIED.

Astec's Motion in Limine to Exclude Gerald Goldhaber's Testimony (Doc. 74) is DENIED.

Astec's Motion in Limine to Exclude Thomas Berry's Testimony (Doc. 75) is GRANTED insofar as the court will limit Mr. Berry's testimony as to switching the auger from right-hand to left-hand flighting. The motion is otherwise DENIED.

65

Astec's Motion to Compel Payment of Fees incurred in connection with Mr. Brickman's February 2025 deposition (Doc. 81) is GRANTED.

Plaintiff's Motion to Preclude the Opinions of Dennis Brickman (Doc. 85) is DENIED. The court anticipates entering a new case management order that will grant Plaintiff an opportunity to serve a surrebuttal report. The court grants the parties 30 days to submit a new proposed case management order.

Dated this 13th day of July, 2026.

Geoffrey W. Crawford, Judge
United States District Court